## W. B. CONKEY CO. v. RUSSELL et al.

### In re BESSETTE.

#### (Circuit Court, D. Indiana. October 19, 1901.)

1. JURISDICTION OF FEDERAL COURTS—DIVERSITY OF CITIZENSHIP—COLLATERAL ATTACK.

    Where the requisite diversity of citizenship to give a federal court jurisdiction appears on the face of the bill, the jurisdiction cannot be attacked by evidence dehors the record in a collateral proceeding by one who was not a party to the bill.

2. CONTEMPT—CONSPIRACY TO DEFEAT INJUNCTION — JURISDICTION TO PUNISH.

    Where a federal court has issued an injunction directed against the defendants in the suit, and which has been served upon them, such court has jurisdiction to punish for contempt any person who, with actual knowledge of the injunction and of its scope and effect, combines and confederates with defendants who were enjoined for the purpose of violating and resisting it, and who, in pursuance of such conspiracy, aids and assists in the commission of acts which were enjoined. This jurisdiction exists by reason of the conspiracy to defeat the process of the court, and although such person is a stranger to the suit, and, by reason of his citizenship, could not have been made a defendant therein.

On Proceedings for Contempt against Edward E. Bessette for conspiracy with defendants to defeat the restraining order issued therein.

Newman, Northrup & Levinson, Benjamin V. Becker, and Morris & Newburger, for complainant W. B. Conkey Co.

W. V. Rooker, for respondent Edward E. Bessette.

BAKER, District Judge (orally). I am ready to dispose of this matter now. I feel that I am as sufficiently advised as I would be by giving the matter further reflection. I desire to commence by saying that there is a vast deal of evidence that has been introduced that is totally immaterial to the matter that the court has in hand for decision. The court is not concerned with the organization of the labor union. It is immaterial to the court what the people may think about it,—whether it is right or wrong. That is not in the case. Men have a right to organize into unions if they choose to do so. Nor is it a matter of any moment as to whether or not the original controversy that was started a long time ago between the Chicago Typographical Union and the Conkey Company was founded in justice or injustice. That is of no consequence. The court cannot try that, and the court does not know enough about it to form any judgment about it one way or the other. It is immaterial to the court whether or not Mr. Conkey was arbitrary and niggardly in his dealings with his employés. That is not before the court. The court has nothing to do with it. It is not a matter of any concern to the court. The court has nothing to do with the question as to whether or not Mr. Alting, who appears by the evidence to be the head and front of the original trouble resulting in the strike, was insolent and lazy and incompetent, and unfit to be employed in any decent establishment. That is immaterial. He was discharged,—whether rightly or wrongly discharged is imma-

terial to this case. The court cannot try that question. But there was started a strike; and parties have a right to quit, leave their work, if they choose to do so, just as an employer has the right to lock up his establishment and refuse to give labor to men then in his employ. The court has nothing to do with that. I make these observations for the purpose of stripping this case of matters that are extraneous; that are totally foreign to the question that is on trial here. The merits of the controversy between the Conkey establishment and its employés, the merits of the controversy between the Typographical Union of Chicago and Mr. Conkey, the question as to whether or not the 20,000 men who are said to have voted against Mr. Bryan because a history of his life prepared by somebody was printed at the Conkey establishment,—all that is matter that is foreign to any issue that we have here.

Now, what have we to deal with in this case? We have in this case, simply this,—nothing more: We have a petition and information, as it is styled, containing a large number of charges, that sets out that on a certain day (the 24th day of August) the circuit court of the United States for the district of Indiana issued a temporary restraining order enjoining and restraining all of the defendants named in that bill from doing certain specified acts. They were enjoined from interfering with the prosecution by the Conkey Company of its legitimate and lawful business. They were forbidden to trespass upon its premises. They were forbidden to interfere with people who were either in the employ of the Conkey Company, or others who might engage in their employment. They were prohibited from committing acts of violence, of intimidation, or of interference with them. That was the nature and scope, in a few words, of the original writ of injunction. The original writ of injunction, in addition to specifying the parties defendant in that bill, also contained statements that all other persons, either as agents, servants, employés, or attorneys, should be restrained, and also every person, under the phrase "and any and all persons aiding and abetting said defendants," is enjoined and restrained from conspiring with, aiding, and abetting the men who were named in the bill, and who are charged with committing acts of violence and wrong against the business of the Conkey Company. Such, in a few words, was the general scope of the restraining order.

Now we come to the information or petition that was filed on which Mr. Bessette has been on trial. That starts out by referring to the original bill, and stating in general terms the character and scope of that bill, the purpose for which it was filed, and by reference to the original bill on the files of the court it makes that original bill a part of the information, for greater certainty. It then proceeds to set out in general terms the character of the restraining order that was issued, and the persons against whom it was issued. It then proceeds to allege that Mr. Bessette, among others who are named, who are not parties to the original bill, has conspired, confederated, and combined with the parties, or some of them, who were specifically enjoined by name, for the purpose of violating that injunction; and then it alleges that, having joined that conspiracy, confederation, and combina-

tion of men who were directly enjoined, he aided and assisted in defeating and disregarding the authority and lawful order of the court in its execution. It then goes on and specifies a large number of instances. It does not confine itself to the general character of them, but it specifies a large number of particular instances of intimidation, of violence, of outrage, of insult, and of the oppression that was practiced by men who were enjoined, and by Mr. Bessette and others who united themselves to this combination. Now, on that the question has been made as to whether or not Mr. Bessette, not having been made a party to the original bill, and it being shown that his citizenship was in the state of Illinois,—the same state of which the corporation plaintiff in the original bill was a citizen,—this court can take jurisdiction of him for the purpose of punishing him as a co-conspirator and aider and abettor of the men who were enjoined by name, in trampling under foot the order of the court. The court has read the cases that were cited by counsel yesterday, which struck the court, if they were to be carried to the extent that counsel asserted, as being revolutionary of all the learning that the court had ever acquired on the subject of the meaning, effect, and scope of an injunction. And the court was, by the oily and persuasive tongue of counsel in reading particular sentences, somewhat impressed with the fact that it might be that nobody could be punished for a violation of an injunction except the men who were named as defendants in the bill in which the injunction was issued, and against whom, by name, a restraining order had been granted. But on reading the cases the court finds that its comprehension of what the law was on that subject was not at fault.

The English case that is referred to (Seaward v. Paterson [1897] I Ch. 545) was a case in which a landlord had leased a large room in a very large building. The building was occupied by a large number of tenants of the landlord, and in the lease to a man by the name of Paterson, which was a lease for the purposes of a private club, there was a covenant providing that the lessee should not use or occupy the demised premises in any such way as created noise or a nuisance, or to interfere with the comfortable enjoyment by other parties of the rooms that they had rented. Mr. Paterson had permitted boxing games to be carried on, crowds of people to come there, betting and drinking to take place, and a bill was filed by the landlord (Seaward, 1 think his name was) against this tenant, in which these acts were charged; and it was alleged that they were in violation of the covenants of the lease, and that they were injurious to the landlord; that they were a nuisance to his other tenants; and that the continuance of them threatened serious loss to the landlord in the enjoyment of the residue of his building. An injunction was issued against Paterson, the lessee, by name, and he was restrained, and his agents and servants were restrained. That was the scope of the injunction. On two occasions after this injunction had been issued, boxing games, betting, and drinking were carried on in this club room in violation of the terms of the injunction, and a motion, as it is called (that is to say, a statement under oath, verified by somebody, setting out the facts constituting

a violation of the restraining order), was filed with the court against the lessee and against two other men (Sheppard and Murray), charging Sheppard and Murray with being the parties who were really running things. They were called "servants" in the motion. They were called "aiders and abettors" in the motion. Judge North, who tried the case, was of opinion from the evidence that the head and front of the concern was one or the other of these two men, who are not named in the injunction at all; but he ruled that they could be punished for the contempt, and the contemptuous disregard of the order of the court, on the ground that they were aiders and abettors, and by so doing they made themselves responsible precisely the same as the party originally restrained.

Now, the Reese Case (In re Reese [C. C. A.] 107 Fed. 942): I will not say whether I regard that decision as sound or not. It is an extreme case in its views, and in a court in which the law is not as rigorously administered in such matters as it is in some other courts of the United States, or in the supreme court of the United States. But in that case there is nothing decided, nor anything that fairly could be construed as stating, arguendo, in the opinion of the judge, anything that tends to support the theory that, where a number of people are restrained by the order of the court, others who are not so restrained by order of the court, but who know of the order of the court, may not be punished, if it is shown that they combined, confederated, and conspired with the party or parties who are restrained, and aided, abetted, and assisted the restrained party in doing the acts forbidden. That case does not hold that. It is very careful to say that that does not appear in that case. It says that, so far as Reese was concerned, it did not appear that he was acting in conjunction with the men who were enjoined, as a conspirator, as an aider, or an abettor, or otherwise; that he had done the things prohibited by the restraining order independently of the parties restrained, and as an original wrongdoer. The court admits that even then, on a proper proceeding, he might be punished.

In the case of In re Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110, Mr. Justice Brown, delivering the judgment of the court (and it was the unanimous judgment of nine learned justices of the supreme court of the United States), said:

"The only question which can properly be raised upon this writ is whether the circuit court exceeded its jurisdiction in holding the petitioner for a contempt, and in imposing upon him a fine therefor."

Now it goes on and says:

"The original bill averred the complainant, the Toledo, Ann Arbor & North Michigan Railway Company, to be a corporation and citizen of the state of Michigan, and the several railway companies defendant to be citizens either of Pennsylvania or Ohio, and there is nothing in the record of that case to show that this averment was not true."

That is to say, the jurisdiction in the original case of the Toledo, Ann Arbor & North Michigan Railway Company against the other railway companies—the ground of jurisdiction set up in the bill as stated by the learned judge who delivered the opinion of the supreme court—was a diversity of citizenship; that the complainant,

the Toledo, Ann Arbor & North Michigan Railway Company, was a citizen of Michigan, and the other railway companies that were sued, and against whom a mandatory injunction was issued, commanding them to receive from the Ann Arbor Company its cars, were citizens of other states. The sole ground of jurisdiction was diversity of citizenship. "And there is nothing," says the court, "in the record of that case to show that this averment was not true. It only appears to be otherwise by an allegation in the petition for the habeas corpus; and the question at once arises whether, where the requisite citizenship appears upon the face of the bill, the jurisdiction of the court can be attacked by evidence dehors the record in a collateral proceeding by one who was not a party to the bill,"— just as it is sought to be raised here by an answer saying that certain men named in the original bill are citizens of Illinois, and not citizens of Indiana, as alleged in that bill. I am reading from the Lennon Case, in 166 U. S., at page 548, 17 Sup. Ct. 658, 41 L. Ed. 1110. Now, in the writ of habeas corpus that was sued out in the supreme court of the United States the averment in the original bill that was filed by the Ann Arbor Company was traversed and denied, but that is a question that the court say cannot be collaterally raised. It was held that it could not be collaterally raised in that case, and it cannot be in this case. Notwithstanding parties here in this case say that the allegation is false that certain of the defendants are citizens of Indiana, that issue cannot be tried, except upon a proper issue, and proof being made in that case, and not in this case. "It only appears to be otherwise by an allegation in the petition for the habeas corpus; and the question at once arises whether, where the requisite citizenship appears on the face of the bill," as it does in the Conkey Case, "the jurisdiction of the court can be attacked by evidence dehors the record in a collateral proceeding by one who was not a party to the bill. We know of no authority for such action." Mr. Bessette is a stranger to the bill. He seeks collaterally, being a stranger to the bill, to raise an issue that can only be raised in the original suit by the very parties to the bill. I agree with the supreme court of the United States that I know of no authority, and never heard of one, that would authorize a stranger to a bill in equity (a man who is not a party to it) to raise a question as to whether or not the averments in the sworn bill (sworn original bill) were true or false. It cannot be done. In other words, a stranger cannot fight a battle or wage a contest for the parties to the bill. That cannot be done. "The general rule is that parties to collateral proceedings are bound by the jurisdictional averments in the record, and will not be permitted to dispute them, except so far as they may have contained a false recital with respect to such parties." Of course, if in this petition or information they had stated who were the parties in the original bill, and stated that falsely, that could be met. "Doubtless the averments with regard to citizenship might have been directly attacked by any one who was a party to that suit. Irrespective, however, of this, we think the bill exhibited a case arising under the constitution and laws of the United States."

Now we come to another point,—the second point decided by the court:

"The facts that petitioner was not a party to such suit, nor served with process of subpœna, nor had notice of the application made by the complainant for the mandatory injunction, nor was served by the officers of the court with such injunction, are immaterial, so long as it was made to appear that he had notice of the issuing of an injunction by the court. To render a person amenable to an injunction, it is neither necessary that he should have been a party to the suit in which the injunction was issued, nor that he should have been actually served with a copy of it, so long as he appears to have had actual notice."

That I understand to be the law. Nor do I understand that this application for the punishment of Mr. Bessette and the other parties against whom a rule was issued by the court to show cause why they should not be punished for the matters and things set out in the petition and information against them asks for any relief in the way of damages or otherwise in favor of the Conkey Company. So far as I read it, the whole scope of it, the sole purpose of it, is the complaint of the Conkey Company, in the nature of a petition and information advising the court that the conspirators uniting with the parties who were enjoined by the court had combined and confederated and proceeded to defy the order of the court, and it prays that they may be punished. It is punishment that is asked for,— that they may be punished. Now, I have said enough to indicate that I think, under the law, the court has jurisdiction to do that thing, if the proofs sustain the charges, not on the ground that Mr. Bessette and the other conspirators who are named, but are not parties to the original bill, are directly restrained, but because they have made themselves amenable to the process for contempt by combining and confederating with those who were enjoined, and by aiding and assisting them in the violation of the injunction of the court. And the court, if it should assess a punishment against Mr. Bessette, would assess it on the theory—and such would be the finding that the court would make in passing its judgment—that, with full knowledge of the scope and effect of the restraining order, he did wrongfully and unlawfully unite, combine, and confederate with the defendants named in the bill, and who were by name restrained, for the purpose of thwarting and defeating the effect of the writ of injunction issued by the court, and that he did, in pursuance of such conspiracy, aid, abet, and assist them in acts of violence in violation of the injunction. That I understand to be the scope and character of the charge, or charges, rather, that are made against Mr. Bessette, with others. And such I understand to be the law applicable to those charges. Now, did Mr. Bessette know of the restraining order? The evidence in this case shows that Mr. Bessette is a member of the Typographical Union No. 16, of Chicago, Ill. The evidence before the court shows that on the 24th, I think it was, of August,—but the precise date is not very material,—a restraining order was issued, forbidding the acts that I have heretofore generally indicated; that on Sunday, the restraining order having issued on Saturday, the restraining order was actually served either on the whole or a large number of the parties defendant to the orig-

inal bill. The evidence shows that at least 500 copies of that order were posted in conspicuous places in and about the city of Hammond, in the roadways leading to the Conkey plant, and around the entrance to the Conkey plant. The evidence also shows that the substance and scope of the order itself was published in a large number of papers in the city of Chicago, and in at least two papers in the city of Hammond. It appears that this man, Bessette, was sent down by the Chicago Typographical Union at a wage of $3.50 per day, and his spending money for incidentals and necessaries to the amount of $7 or $8 a day. He came down there on Tuesday, the second day after the writ had been served. If there was no other evidence to show Mr. Bessette's full knowledge of the scope and effect of the restraining order, the court would have no trouble whatever in finding that he was chargeable with notice of the restraining order even before he left Chicago. It appears that there was a conference about it at that typographical union, and that the executive officers acted on that injunction. It does not appear that the Chicago Typographical Union had conceived any such affectionate regard for the people who did not belong to their organization at all, and who were working for Conkey, and who had as early as the 20th or 21st of August gone out on a strike, until after the court had issued a restraining order which was calculated to tie the hands of those strikers, nor feel that it was incumbent to send down a lot of missionaries for the purpose of aiding the strikers. It seems that the Chicago Typographical Union and its executive officers were entirely content until the complainant had got a restraining order restraining acts of lawless violence and terrorism and depredation, and were content to let the Conkey Company fight it out with the strikers without any interference on the part of the Chicago Typographical Union. But as soon as the executive officers of that concern had learned of the injunction, and doubtless anticipating that the men who were enjoined would not want to run into the peril of being sent to jail for violations of the order, they felt that it was necessary to come to the rescue. Bessette is chargeable with knowledge of all that. I cannot conceive that the Chicago Typographical Union, or its executive officers,—because it is said that what was done by that union was done by these executive officers,—in view of the fact that they had not hired men like Mr. Bessette and Harding and Colbert to go down there and help these strikers until after the injunction was issued, that they had the sinister purpose of attempting to thwart the order of the court in sending them down there immediately after its issuance. They doubtless thought that the fight had become unequal, when the court had intervened for the purpose of protecting the employés and the property rights of Conkey, and that the time had come for the typographical union to take a hand in the fight, in order to equalize the balance of power. That is the way it looks to me. I cannot conceive any other purpose that they could have had. Now, this man knew before he went down there—before the Tuesday following the Sunday on which it was served—he knew of the injunction. He was hired to go down there. Mr. Colbert and some of the other witnesses pretend that

.it was for the purpose of getting these men (discharged men, men that had been run out of the typographical union) to apply, and giving them cards, so that they might apply at the meeting that would be held a month later at Chicago, for reinstatement. But, if they were animated by that compassionate view after the restraining order was issued, how does it happen that their bowels of compas-.sion were not moved by these same men who were out and fighting before the restraining order was issued? I think that is a circumstance that throws a flood of light on the whole history of the conduct of these men who were sent by the typographical union to this contest at Hammond. They would have been very foolish to have sent men down there for that purpose; very foolish. The men there knew where the Typographical Union of Chicago was. They could have sent their cards down to Hammond without sending men down at an expense, as Mr. Bessette has said, of $10 or $12 a day to his concern. And what the expenses of the other people were, the evi-.dence does not show; but there was a half dozen of them, more or less, that were running back and forth almost daily, and stopping a large part of the time at Hammond. There was a man by the name of Spires. He was down there at the Monon Hotel, where the striker Alting, who was the president of the strikers, was dwelling and made his habitat. Of course, these men would have the court believe that that was all purely accidental; that they all had their rooms, and slept, if they did sleep, and took their meals at the same place as the president of the strikers who had been enjoined. While such things do sometimes happen accidentally, the accident ought not to continue too long, or else people would be disposed to suspect that, instead of being an accident, it was intentional, and that it was for some purpose that was to be accomplished. Now, the Chicago Typographical Union had no interest, even as a labor organization, with the people down there in the Conkey plant. They were not members of the typographical union. Most of them, as Mr. Colbert admitted, had been at one time members of that union, and for some infraction of the rules of the order had been expelled. There was no member of the Chicago Typographical Union down there to be protected. They were strangers. They were aliens to the household of faith consisting of members of the Chicago Typographical Union. He went down there as a hired man, and, if we are to believe the excuses that have been offered by his counsel and by Mr. Colbert, he went down there practically to accomplish nothing. The court cannot believe that the sole purpose of having half a dozen members of the Chicago Typographical Union down there, one of them paid $3.50 a day, and with $7 or $8 a day for expenses added, was simply to have them hand out cards notifying these strikers that they might apply either for reinstatement or for admission, on the 29th of September following, into the typographical union. It taxes human credulity to believe that that was the purpose. The court must believe that the purpose was to do just what the evidence in this case clearly and indisputably shows was done. This defendant, without any excuse or any valid reason, with his eyes wide open, with perfect knowledge of the order of the court,

did unite, combine, confederate, and enter into a conspiracy with the very men that this court had enjoined, with the deliberate purpose of defeating and thwarting the restraining order of the court. It would be idle to recapitulate the evidence. The whole of it, on both sides, when fairly construed, has an irresistible tendency leading in one direction. This defendant made himself a party to that conspiracy. The evidence shows a violation of the order of the court by these strikers, and whatever was done by these strikers was done by those who were not present, but who have combined and conspired and confederated together to do these things, because it is a rule of law—it is a rule of eternal justice and right—that every man who conspires with another man to do an unlawful act shall be held answerable for that act when it is done by his co-conspirator, although he be not personally present. Men are hanged on that theory, they are sent to prison on that theory, they are punished by courts on that theory, and the fabric of human society would be dissolved on any other theory than that in the administration of justice.

I shall not recapitulate the items of evidence in this case establishing the defendant's guilt. One witness, at least, has testified—I don't know but more, but one uncontradicted witness has testified—that this man Bessette, when a train came in with men employed and under the charge of the young man by the name of Hunt for the purpose of going up to the factory to work, this man Bessette, when he raised his hand or crooked his finger, a mob of strikers would run to intercept these men. Oh, they say, they did not use force. But numbers, with their minds concentrated on the accomplishment of a given purpose, constitute force. As I had occasion to say the other day, if I should be met by half a dozen men on a lonely road in the dead of night, and they would say in the politest language that ever was used by a man that cut a throat or scuttled a ship, "We beg of you to be so kind and considerate as to give us your watch and purse," I should naturally feel that it was my duty to give them. But there is proof of actual violence. Men employed there were beaten by this combination of men, assaulted, knocked down. Their lives were imperiled. They were warned that their heads would be knocked off, with indecent epithets and vile and profane language. They were enjoined not to picket the works, and not to interfere with men who wanted access to and from the works in their lawful employment. The testimony shows that this man, as a co-conspirator with men who were enjoined against doing that thing, on more than one occasion did that thing. The evidence shows that a body of unknown men—the evidence does not show who they were, but thugs from Chicago—were brought down, and they were called a "wrecking crew." A crew to wreck what? Is it to be supposed that these thugs, these bullies, came down from Chicago simply from motives of love and affection for the strikers, without invitation from any one that was interested in defeating and thwarting the order of the court? Or is it to be supposed that if Mr. Bessette, Mr. Colbert, Mr. Spires, and others connected with the typographical union were honestly desirous of seeing that the lawful order of this court was

carried out, they would not have taken steps, active and efficient, to see to it that those thugs were sent back to their dens and places of infamy in Chicago, instead of being kept at Hammond for the purpose of terrifying not only men, not only women in their homes with their babes and children, but for the purpose of terrorizing and applying epithets to mere girls of 14 and 15 years of age, unfit to be repeated not simply in the presence of women, but in the presence of decent men?

I have thus said enough to indicate that I think this court has jurisdiction under this petition to punish this man, and that, with full knowledge of the restraining order, he flagrantly, and for a price, with the silver pieces in his hands, went down there to Hammond for the purpose of defeating the restraining order of the court. The only question is, what punishment ought to be inflicted? The punishment ought not to be inflicted on the basis of cruelty or severity. It ought not to be inflicted for any other purpose than that of reforming the man and restraining him who is punished, and for the purpose of furnishing an example to others who may be disposed to commit like offenses. I think in this case that the ends of justice would be served by inflicting a fine; and the judgment of the court is that the defendant be fined, for the contempt charged, in the sum of $250 and the costs of prosecution, and that he stand committed to the jail of Marion county, Ind., until the fine and costs are paid, or until he is discharged by due course of law; and the marshal is charged with the execution of this sentence.