## Ex parte RICHARDS et al.

### (Circuit Court, S. D. West Virginia. August 13, 1902.)

1. EQUITY—INJUNCTION—VIOLATION—SERVICE OF PROCESS.

    The violation of an injunction is punishable as a contempt, though at the time of the violation no process had been served on defendants in the bill.

2. SAME—PLEADING—ALLEGATIONS.

    In answer to rules in contempt proceedings for the violation of a restraining order in the district court for the Southern district of West Virginia, defendants in the rules, who were residents of West Virginia, and not named in the bill, stated that they were advised that they were parties to the original bill. The bill stated that it was brought against the defendants named, "their confederates, associates," etc., whose citizenship and residence were unknown. *Held*, that such defendants in the rules were not parties to the bill, since the allegation must be treated as referring to defendants who could be made parties, and so could not refer to any resident of West Virginia, and no defendant can be made defendant to a bill save by name.

3. SAME—JURISDICTION—COLLATERAL ATTACK.

    The question of jurisdiction to entertain a bill cannot be made by persons not parties to it, in a collateral proceeding to punish them for violation of a restraining order in the suit.

4. SAME—EVIDENCE.

    Evidence considered, and *held* to show defendants in contempt proceedings for violation of an injunction to have been "confederates and associates" of defendants in the bill on which the order was issued.

5. SAME—SERVICE OF INJUNCTION—ABSENCE OF SERVICE.

    It is not necessary that a person be served with an injunction, in order to render him amenable to its provisions, if it appears that he had reasonable notice of it.

6. SAME—INJUNCTION—CONSTRUCTION.

    An injunction restrained defendants, their associates, etc., from congregating in or about the premises of plaintiff for the purpose of inducing its employés to quit work; from conducting or leading any body of men up to or upon the premises of plaintiff; from interfering with plaintiff's employés on its land or premises; from interfering with the plaintiff's employés, or with any person desiring to enter its employment, by the use of threats, personal violence, or intimidation, or by any other means whatsoever calculated to intimidate, terrorize, and alarm or place in fear any of the employés of the plaintiff in any manner whatsoever at or upon its premises; and from in any unlawful manner interfering with the plaintiff's employés while they might be passing to and from their work on and near the plaintiff's premises. *Held*, that the meaning of the order was that the defendants and all persons subject to it were inhibited from personal violence or intimidation of any sort towards the employés of plaintiff, even though such acts of intimidation were not performed on plaintiff's premises.

7. SAME—INJUNCTION—VIOLATION—EVIDENCE.

    Evidence considered, and *held* to show a violation of an injunction restraining defendants from intimidating or interfering with plaintiff's employés.

In Equity. Upon rules and attachments for contempt.

Geo. W. Atkinson, Dist. Atty., Elliott Northcott, Asst. Dist. Atty., J. W. St. Clair, C. W. Dillon, and C. R. Summerfield, for the United States.

S. C. Burdett, J. W. Linn, and Adam Littlepage, for defendants.

¶ 5. See Injunction, vol. 27, Cent. Dig. § 446.

KELLER, District Judge. On the 27th day of June, 1902, Collins Colliery Company filed its bill of complaint against Joe Crisco, Paul Dufaith, "Mother" Jones, Mike Miller, who were alleged to be citizens and residents of the state of Pennsylvania, W. B. Wilson, a citizen and resident of the state of Indiana, Chris. Evans, a citizen and resident of the state of Ohio, and certain other defendants, whose citizenship and places of residence were alleged to be unknown to the plaintiff. The plaintiff is a corporation created and organized under the laws of the state of West Virginia, and in its bill alleged these facts, and that its place of business is in the county of Fayette, in the state of West Virginia, where it is engaged in the operation of a coal plant giving employment to about 600 laborers; that it produces from 1,200 to 1,500 tons of coal per day, for which it finds market and sale in many different states in the Union; that it has expended the sum of $250,000 in the construction and erection of its plant; that it is operating under lease a tract of coal land containing about 1,300 acres, for which it must pay a minimum royalty of $10,000 per year, whether it operates the coal tract or not, and that if it should not operate this coal plant the payment of the royalty would be an actual loss to it; that it is under contract to furnish large quantities of coal for the markets aforesaid; that it is operating its plant to about one-half of its capacity, and using the output therefrom in the fulfillment of its said contracts, and that it will be able to fulfill the said contracts and properly conduct its business if not hindered or delayed in the operation thereof; that about one-half of the miners engaged for it, and other employés, are working under contract in the matter of mining and producing coal, and are receiving wages with which they are satisfied and in all respects contented; that the remainder of the miners and employés engaged as such at its mines are willing to work and continue their employment, but that they have been and are partially idle because they have been intimidated and put in fear on account of the actions of the defendants and their confederates; that there has been and is in existence what is called a "miners' strike" in the region in which the complainant's mine is situated, and that in pursuance of the said strike and its promotion there is a confederation, combination, and association of men organized to that end, and that the defendants named in the bill are among the men so organized, and for that reason came into the state of West Virginia, and have gone among the coal miners and other employés engaged in mining coal and laboring in the plaintiff's plant for the sole purpose of inducing and persuading the plaintiff's miners and other laborers to quit work, and have indulged in threats, menaces, inflammatory speeches, and demonstrations; and complainant avers that, if this course is pursued, its employés who are now at work will be intimidated and coerced from mining coal and the performance of all other labor; that the said actions of the defendants have already been the means of causing a large number of complainant's employés to quit mining and laboring for the complainant; that the defendants named in the bill are insolvent, as complainant is advised and alleges, upon information; and that therefore they will be wholly unable to respond in damages for the injuries thus done,

and complainant will be irreparably damaged, which injury and damage, it is alleged, will largely exceed in amount the sum of $2,000. Complainant further alleges that there are others associated with the named defendants, whose names are unknown to the complainant, and are confederating with the said defendants for the purpose of aiding and promoting the acts aforesaid, and for the purpose of intimidating and coercing the employés of the complainant to cease their work; that the defendants are leaders in different labor organizations, and are engaged in the business and occupation of creating agitations and disturbances among the coal miners of this and other states; and that they are now engaged in the work of endeavoring to organize the employés in the employment of the complainant. Complainant further alleges that under the leadership, control, and management of the defendants there are large bodies of men who congregate near complainant's coal plant; that they have been in close proximity to complainant's employés, making inflammatory speeches, and that they have threatened to march with said bodies of men through and over the premises of the complainant, which, it is alleged, is for the purpose of intimidating, scaring, and coercing the men who are now engaged at work for complainant, and for the purpose of causing them to stop their employment; and complainant avers that unless the defendants and such agents and confederates are inhibited from further conducting such meetings, and from marching through complainant's premises, the defendants, through this agency and by this means, will intimidate complainant's said coal miners and other employés, and thereby indirectly coerce them to quit their labor and employment, to the great loss and damage of complainant; that the defendants and their said agents and confederates have made violent threats against the employés of complainant, should they continue in their employment; that such threats have been to the effect that complainant's employés would be "killed and riddled with bullets" if they continued in complainant's employment; and that by such threats and the other means aforesaid the defendants, or some of them, their associates and confederates, are about to cause complainant's employés to cease work. The bill contained a prayer for an injunction restraining and inhibiting the defendants hereinbefore named, their confederates, and all others associated with them, from in any manner interfering with complainant's employés by the use of threats, personal violence, or intimidation, or by any means whatsoever calculated to terrorize or alarm the employés of the complainant, etc.

Upon the filing of this bill a temporary injunction was granted, restraining the defendants named in the bill, their confederates, and all others associated with them, from interfering with the plaintiff's employés now in its employ at or upon its premises, or from interfering with any person in or upon its premises who may desire to enter its employment, by the use of threats, personal violence, or intimidation, or by any other means whatsoever calculated to intimidate, terrorize, and alarm or place in fear any of the employés of the plaintiff in any manner whatsoever, at or upon its premises. And the defendants and all other persons associated with them were

further enjoined from undertaking, by any of the means or agencies mentioned in the plaintiff's bill, from going upon the plaintiff's land or premises to induce or cause any of the said employés to quit or abandon work in the mines of the plaintiff or upon its premises, and from congregating in or about the premises of the plaintiff for the purpose of inducing the employés in said mines to quit and abandon work in them. And the defendants, their confederates and associates, were further restrained from conducting or leading any body or bodies of men up to or upon the premises of the plaintiff for the purpose of inducing or causing the plaintiff's employés to quit and abandon working for the plaintiff, or from in any manner interfering with, directing, or controlling plaintiff's employés on its land or premises, or from interfering in the business of the plaintiff upon its land or premises. The defendants, their associates and confederates, were further enjoined from going upon any part of the plaintiff's land and premises for the purpose of intimidating, coercing, or endeavoring to procure and induce the plaintiff's employés to cease working in its mines and upon its premises, by any improper threats, unlawful means, or agencies whatsoever, and from in any unlawful manner interfering with the plaintiff's employés while they may be passing to and from their work in the said mines, on and near the plaintiff's premises.

A hearing upon a motion for a permanent injunction was by error set down for the 16th day of July, 1902, at the United States court room at Bluefield, and upon that day, it appearing that the plaintiff's bill would not be matured until September rules, an order was entered continuing the hearing upon said motion to the first day of the September term of the court at Huntington. In the meantime, on the 19th day of July, 1902, the plaintiff presented to the judge of this court, sitting in chambers, its petition setting forth that since the issuance and service of the said injunction order, to wit, on the 17th day of July, 1902, certain persons named in said petition, who in said petition are alleged to be agents and confederates of the defendants named in the original bill, together with other persons, making in all a body of about 400, were conspiring and confederating together for the purpose of causing petitioner's employés to quit their employment, and for the purpose of intimidating and coercing the miners and other employés who were engaged at work for petitioner from continuing their work and labor; that in pursuance of said combination and conspiracy the parties named therein, together with the unknown persons making up the said body of men, gathered upon a certain level piece of ground lying adjacent to petitioner's premises, and that John Richards, who is alleged in the said petition to be the leader of said body of men, made a speech to them that was calculated to incite disorder and breaches of the peace; that large portions of said body of men (those named in the petition being a part thereof) marched up to petitioner's premises in a threatening and violent attitude, and while there cursed, abused, and threatened petitioner's employés, calling them "scabs," "thieves," etc.; that the said body of men are still camping upon and holding meetings upon said piece of land near said petitioner's mines, and continuing their interruptions and

menacing noises, etc. This petition was duly sworn to, and thereupon, by direction of the court, the rules and attachments which are the subjects of the present inquiry were directed to be issued.

Prior to the hearing upon the rules a motion was made to quash the rules and attachments awarded herein on the ground that the court had no jurisdiction to issue the same, the defendants being all citizens of the state of West Virginia, and by reason of the citizenship of the plaintiff could not have been made parties to the original suit, and that therefore the court is without jurisdiction to award a rule against them for violation of its injunction issued in said suit. The argument upon this point was ingenious and able,—particularly that portion insisting that jurisdiction of the original suit is acquired only by service of process, and that process was not served on any of the defendants to the bill until after the alleged violations of the preliminary restraining order; but if, as is conceded, the court has power to issue a temporary and preliminary restraining order, it is not perceived upon what theory it is denied the power to punish violations thereof merely because process has not yet been served in the suit. This motion is overruled on the authority of the following cases: Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110; U. S. v. Agler (C. C.) 62 Fed. 824; American Steel & Wire Co. v. Wire Drawers' and Die Makers' Unions (C. C.) 90 Fed. 598; U. S. v. Sweeney (C. C.) 95 Fed. 435; Conkey Co. v. Russell (C. C.) 111 Fed. 417.

In the Lennon Case the supreme court of the United States said:

"To render a person amenable to an injunction, it is neither necessary that he should have been a party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears to have had actual notice."

In the case of Conkey Co. v. Russell it was held that:

"Where a federal court has issued an injunction directed against the defendants in a suit, and which has been served upon them, such court has jurisdiction to punish for contempt any person who, with actual knowledge of the injunction and of its scope and effect, combines and confederates with defendants who were enjoined, for the purpose of violating and resisting it, and who, in pursuance of such conspiracy, aids and assists in the commission of acts which were enjoined. This jurisdiction exists by reason of the conspiracy to defeat the process of the court, and although such person is a stranger to the suit, and, by reason of his citizenship, could not have been made a defendant therein."

Upon the authority of these and the other cases above cited, I have overruled the motion to quash the rules and attachments.

Answers were filed by the several defendants to the rules, which answers deny in most instances the acts charged in the petition, but admit that a meeting of striking miners was held on the 17th of July, 1902, on a certain property in the Glen Jean bottom, in which meeting the defendants participated; but they deny any intentional violation of the injunction order of the court, and, in effect, deny all of the other allegations of the petition. The answers are both numerous and voluminous, and it can serve no purpose to here attempt to set forth in detail the allegations contained therein. In each of these answers there was a statement that the defendant in the rule

is advised that by the bill and process issued thereon he is a party to the original suit of Collins Colliery Company v. Joe Crisco and others, and therefore insists that upon the face of the bill the court has not jurisdiction of the said cause. To these allegations in the answers the government, by its counsel, excepted, and said exceptions are sustained. I cannot hold that these defendants, or any of them, were, or were attempted to be, made parties to the original suit. The only language in the original bill that could give color to any such claim is the statement contained therein that it brings its suit against the defendants named, and against their "confederates, associates, agents, and promoters, whose citizenship and places of residence are to your orator unknown." In the prayer the bill asks for the process of subpœna against the defendants named in the bill, and "against their confederates and associates, when their names shall have been discovered." The court is bound to treat this allegation in the bill and this prayer for process as referring to defendants who could properly be made parties, and therefore that allegation in the bill could not have referred to any resident of West Virginia. Moreover, no defendant can be made a defendant to a bill except by name, and before any of these parties could have been made a party to this bill a proper order of the court, upon petition of the plaintiff, would have to be entered. Holding as I do, that these persons are not parties to the bill, I must further hold that the question of jurisdiction to entertain the original bill cannot be raised by persons not parties to it, upon a collateral proceeding. Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110; Conkey Co. v. Russell (C. C.) 111 Fed. 417.

Upon the hearing of these rules voluminous testimony was offered on both sides, and it now devolves upon the court to determine in each case the following two questions: (1) Does the defendant in the rule stand in the relation of a confederate and associate of the defendants to the bill, or any of them? (2) If so, has he violated the restraining order of the court? Both of these questions must be answered in the affirmative before the court can punish these defendants, because it is only as confederates (that is, aiders and abettors) with the defendants in the bill, or some of them, that the court has any jurisdiction of the defendants to the rules.

The testimony upon the first point develops that most of the defendants to the bill, and, I believe, all of the defendants to the rule, except C. F. Stewart, are members of a secret labor organization known as the United Mine Workers of America, which national order is divided into what are known as "districts," and these districts subdivided into local unions; that district No. 17 comprises the states of West Virginia and Virginia, and that there are local unions at practically every colliery where a sufficient membership can be obtained; that there are numerous local unions in the neighborhood of the plaintiff's mine, and that there is one, at least, at Glen Jean; that W. B. Wilson, defendant to the original bill, is secretary and treasurer of the National Organization of United Mine Workers, and that defendant Chris. Evans is a member of its national executive board; that, of the defendants to the rules, John Richards is president of district

No. 17, and that the others, except C. F. Stewart, are members of various local unions within said district; that on June 7, 1902, a strike was inaugurated in obedience to the order of a district meeting held at Huntington, W. Va., at which meeting some five or six members of the national executive board of United Mine Workers were present, and that the national organization has recognized and aided said strike by furnishing funds for carrying it on, counsel, advice, etc.; that G. W. Purcell, a member of the national executive board of United Mine Workers of America, and a resident of Indiana, has been sent into West Virginia to conduct the strike, and that he has been advising, aiding, and directing Richards in that behalf; that funds were placed to his credit in the Montgomery Bank by means of drafts signed by John Mitchell as president and W. B. Wilson as secretary and treasurer of the United Mine Workers of America; that he paid for provisions and supplies of various kinds purchased of local merchants by checks upon this fund, and that these provisions and supplies were distributed to the local members of the order at their various camps, including the one hereinafter more particularly referred to; that Chris. Evans, another of the defendants to the original bill, and a member of the national executive board, residing at Nelsonville, Ohio, has been and is making purchases of provisions from a firm in Cincinnati, Ohio, for shipment to the mine workers in district No. 17 to the value of about $5,000 daily; that these purchases were shipped in car-load lots and distributed to the members of the local unions, and that about 2½ car loads had been shipped to Glen Jean, where plaintiff's works are located, and were placed in a storehouse rented for the purpose, and daily distributions were made therefrom among the members of the local unions attendant upon the meetings at Glen Jean, and the members living there, during the continuance of the "protracted meeting" at Glen Jean, hereinafter referred to; that J. W. Carroll, another member of the national executive board, and a native of West Virginia, also consulted with John Richards, president of district No. 17, as to the management and conduct of the meetings hereinafter referred to, at Glen Jean, and advised with him in regard thereto; that about July 16, 1902, men from places as far away as seven, eight, or nine miles from Glen Jean began to gather there at a point very near to where the employés of the plaintiff lived and worked, and that John Richards appeared there also on the evening of the 16th of July; that on July 15th he made a speech at a place called "Lookout," where he said he had gotten out the men at Ansted, and that he was going to Cliff Top to get out the men there, and from there to Loup Creek (Glen Jean); that when he got to Glen Jean he made a speech in which he said they were going to hold a protracted meeting until the plaintiff's men came out; that in another speech to the workmen of the plaintiff he told them that "the time is approaching very rapidly when our union will be recognized, and when this union is recognized I want to say to you, my brethren, that I have a list of the men who are here in front of me, and that this list will be placed in the hands of every local union, and that you will not be able to get any work in the United States. If you will come forward as men, and attach

yourselves to the Union, you will be all right"; that these meetings continued from day to day, many of the men from a distance sleeping in a pavilion on the premises and on the ground, and getting their meals at the camp, where there were a number of cooks, or getting supplies from the storehouse before referred to; and that at the date of the hearing the meetings were still going on.

These being the facts, or some of them, disclosed by the evidence, I am forced to the conclusion that the acts done and the things said at Glen Jean on the 17th day of July, and the days immediately preceding and following that day, were done in confederation with the defendants in the original bill, or some of them, at least. It is clear to my mind that this strike, and the method of its conduct, had the approval and support of the National Organization of United Mine Workers of America, and that it was the work of the order at large, of which the defendants in the bill are officers and organizers, and, under the facts shown as to support, assistance, and direction by members of the national executive board, it is not at all too much to say that the statement made by John Richards, the district president, that he had a list of the nonunion men at Glen Jean, and that when the union was recognized they would be unable to get work anywhere in the United States, was authorized by the defendants, and that in making it he was aiding and abetting them in their purposes,—purposes declared by the means and agencies employed, and emphasized by the actions and words of the local members of the order of which the original defendants are leaders.

We now come to the second question, namely, have these defendants violated the restraining order of this court? The evidence in the case is voluminous and conflicting. The sworn answers of the defendants, supplemented by their oral testimony, deny that they ever intentionally violated the injunctional order issued herein. It is in evidence that some of them were not served with the restraining order, but it is also in evidence that the order was posted in many conspicuous places; that it was freely and largely talked about, and that the United Mine Workers had several retained counsel, who were appealed to for information and advice respecting the court's order; and that they gave it as counsel for the order, etc. It is not necessary that a person be served with an injunction in order to render him amenable to its provisions, if it appears that he had reasonable notice of it. Ex parte Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110. Most of the defendants to these rules have admitted that they were perfectly aware of the existence of the restraining order in this case, that they had seen copies of it and had heard it discussed, and that they placed an interpretation upon it which prevented them from going upon the premises of the plaintiff company; but they claim they thought they could go up to its line, and within those limits do as they pleased. A very few of the defendants do not appear to have been served with or to have had knowledge of the restraining order. Some of them cannot read, and the court is loath to attribute a knowledge of the contents of the restraining order to them, in the face of their denial that they knew of it, although the great weight of the testimony is to the effect that it was constantly

talked about, and that the leaders, John Richards and others, in their speeches, cautioned all these people not to violate the terms of the injunction. The court not only does not desire, but would be extremely sorry, to punish any one who, without a knowledge of its restraining order, did acts which with knowledge of the same would be violations of the order; and therefore, reviewing the evidence in this case, the rules heretofore issued against Sam Washington, Joe Smith, R. L. Bess, James McIvor, and Joe Prenosel are ordered to be discharged, as is also the rule against C. F. Stewart, who was not shown to be a member of the United Mine Workers, or to have acted in confederation therewith.

With regard to all the other defendants, it has been shown either that they have been served with the restraining order of the court, or that they had information as to its existence and contents. Have they been guilty of its violation? The order of the court restrained these parties from "congregating in, on, or about the premises of the plaintiff for the purpose of inducing the employés in said mines to quit and abandon work in them"; from "conducting or leading any body or bodies of men up to or upon the premises of the plaintiff for the purpose of inducing or causing the plaintiff's employés to quit and abandon working for the plaintiff, or from in any manner interfering with, directing, or controlling plaintiff's employés on its land or premises, or from interfering in the business of the plaintiff upon its land or premises"; from interfering with the plaintiff's employés, or with any person who may desire to enter its employment, "by the use of threats, personal violence, or intimidation, or by any other means whatsoever calculated to intimidate, terrorize, and alarm or place in fear any of the employés of the plaintiff in any manner whatsoever, at or upon its premises"; and from "in any unlawful manner interfering with the plaintiff's employés while they may be passing to and from their work in said mines, on and near the plaintiff's premises." The true meaning of this injunction is that these defendants, and all other persons who are subject to it, are inhibited from personal violence or intimidation of any sort of the employés of the plaintiff. As to what constitutes intimidation, and consequently acts violative of the court's order, the answer will largely be governed by the circumstances. The following are some of the cases in which injunctions have been sustained, and violations thereof held to have occurred:

"A simple 'request' to do or not to do a thing, made by one or more of a body of strikers under circumstances calculated to convey a threatening intimidation, with a design to hinder or obstruct employés in the performance of their duties, is not less obnoxious than the use of physical force for the same purpose. A 'request' under such circumstances is a direct threat and an intimidation, and will be punished as such." In re Doolittle (C. C.) 23 Fed. 545.

"Where employés of a railroad company that is in the hands of a receiver appointed by the court are dissatisfied with the wages paid by the receiver, they may abandon the employment, and by persuasion or argument induce other employés to do the same; but if they resort to threats or violence to induce the others to leave, or accomplish their purpose, without actual violence, by overawing the others by preconcerted demonstrations of force, and thus prevent the receiver from operating the road, they are guilty of a con-

tempt of court, and may be punished for their unlawful acts. Where a party of men combine with intent to do an unlawful thing, and in the prosecution of that unlawful intent one of the party goes a step beyond the balance of the party, and does acts which the balance do not themselves perform, all are responsible for what the one does. It is essential, however, that there should be a concert of action,—an agreement to do some unlawful thing." U. S. v. Kane (C. C.) 23 Fed. 748.

"We can go to any friend and urge him to do this or do that. That is a part of the common liberties of every man in this country. And the question is not whether these gentlemen went there in a pleasant way, and stated reasons, or urged their friends to quit work, but, did they go with such an intended demonstration of power, and in such an attitude, that though, as they have stated here, they simply requested these engineers and employés to quit, they did it under circumstances that the engineers and the trainmen were intimidated, and quit because they felt compelled to? * * * It is not necessary that there should be actual violence. As my Brother Treat said in a similar case (In re Doolittle [C. C.] 23 Fed. 544) that we had before us in St. Louis, a request, under these circumstances, is a threat. Every sensible man knows what it means, and courts are bound to look at things just as they are, to pass on facts as they are developed, to treat the conduct of men just as it is, and to impute to them that intention which their acts and their conduct disclose was their intention." U. S. v. Kane (C. C.) 23 Fed. 750, 751.

"A writer, signing himself 'Chairman,' sent the following notice to the various foremen of the shops of the Wabash Railway Company during a strike organized to resist a reduction of wages; the railroad being at that time in the hands of a receiver appointed by the United States circuit court: 'Office of Local Committee, June 17, 1885. ——, Foreman: You are hereby requested to stay away from the shop until the present difficulty is settled. Your compliance with this will command the protection of the Wabash employés. But in no case are you to consider this an intimidation.' Held, that this was an unlawful interference with the management of the road by the receiver, and a contempt of court, for which the writer should be punished." In re Wabash R. Co. (C. C.) 24 Fed. 217.

"An injunction was granted and served on defendants, restraining them and all others from in any way interfering with the management, operation, or conducting of the mines named in the bill, either by menaces, threats, or intimidation of any character used to prevent the employés of said mines from going to or from the same, or from engaging in their usual business of mining. Defendants joined a body of over 200 striking miners in marching, with music and banners, past one of said mines and the homes of the miners working therein, marching and countermarching for three days along the public highway between the mine and the homes of the miners, halting in front of the mine, and taking positions on each side of the road which the miners must cross in going to and from the mine, before daylight and late at night, at the time when such miners were going to and from their work. The avowed object of the strikers was to influence the miners to join in the strike, and this marching and halting in front of the mine were with the evident intent to accomplish this object by intimidation, and some of the miners were thereby intimidated and kept away from their work. Held, that defendants were guilty of contempt. Any use of a public highway which prevents its reasonable, seasonable, and ordinary use by the general public or by citizens for purposes connected with their regular business is unlawful, and in a proper case the continuance of such use may be enjoined. The owner of a mine is entitled to the aid of the courts to protect him against the unlawful interference of others in the continued enjoyment of the right to operate his mine, the right to employ the labor of those willing to work, and his right to the use of the highway leading to his mine, for himself and his employés." Mackall v. Ratchford (C. C.) 82 Fed. 41.

"An injunction will be granted where members of labor organizations conspire unlawfully to interfere with the management of the business of a corporation, and to compel the adoption of a particular scale of wages, by con-

gregating riotously and in large numbers at and near the works of the corporation for the purpose of preventing persons not members of said organization from entering the employ of the corporation or remaining therein, by intimidation, consisting in physical force, or injury, actual or threatened, to person or property. The jurisdiction of equity is not ousted because the acts complained of may also be the subject of indictment." Wire Co. v. Murray (C. C.) 80 Fed. 811.

The supreme court of the United States, in the case In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, in summing up its conclusions, stated, among other things, that the proceeding by injunction is of a civil character, and may be enforced by proceedings in contempt; that such proceedings are not in execution of the criminal laws of the land; that the penalty for a violation of an injunction is no substitute for, and no defense to, a prosecution for any criminal offense committed in the course of such violation; that, an injunction having been issued and served on defendants, the circuit court had authority to inquire whether its orders had been disobeyed, and, when they found they had been, then to proceed under section 725, Rev. St., which grants power to punish, by fine or imprisonment, disobedience by any party or other person to any lawful writ, process, order, rule, decree, or command, and enter the order of punishment complained of; and finally that, the circuit court having full jurisdiction in the premises, its finding of the fact of disobedience is not open to review on habeas corpus.

"If the object of a labor union is unlawful, or if the methods employed by it, either to induce acquisitions to its ranks or to accomplish its ulterior purposes, are unlawful, all persons who combine in such efforts are conspirators." U. S. v. Weber (C. C.) 114 Fed. 950.

The case just cited is peculiarly important, because it was a case recently decided in this circuit, and upon which Judge Simonton, a learned and able circuit judge, sat with Judge McDowell, and concurred in the decision, and because it establishes the principle that, where unlawful acts are done by a labor union, the members thereof who take part in such acts are all conspirators.

The evidence in this case is conflicting as regards the acts of many of the individual defendants, but there is no denial of the fact that the men under the leadership of Mr. Richards congregated at Glen Jean for the purpose of holding meetings with the avowed object of getting the men then at work for the plaintiff company to quit; that Mr. Richards, in one of his speeches there, made use of the language heretofore quoted, and that his utterances were applauded by the men gathered there; and that the epithets "scabs" and "blacklegs" were hurled from time to time at the men who were at work and were not members of the Union, although more particularly addressed to men who were at work and had formerly been members of the Union; that these meetings and marches were attended by large numbers of men, greatly exceeding those who were at work for the plaintiff; that the men so at work, or at least some of them, were intimidated and rendered uneasy, and that, had it not been for the presence of armed guards, they would not have felt it safe to work at all; that, as it was, they were rendered so uneasy that they habitually quit work at about the time when the full crowd of strik-

ing miners had gathered, that period usually being at or a little after noon; that at several times small bodies of men separated themselves from the rest of the meeting and called for volunteers to aid them in going into the mines and forcibly taking out the men at work; that individual striking miners were heard to curse and abuse the men at work, and to use contemptuous language regarding the court and its injunctions; and that, in the marches up to the property line of plaintiff, the body of marchers endeavored to induce plaintiff's employés to join them. On the other hand, it has been shown that the leaders of this movement in their speeches counseled obedience to the law; that they believed they were not violating the injunction of this court in holding the meetings and marchings which they held; and the court does not doubt that the men under their direction, and in attendance upon the meetings of which they were the chiefs, believed, as they believed, that in what they were then doing they were not violating the orders of the court. Of course, this statement is subject to a few exceptions, as it has been shown that several of the men were guilty of violent expressions and of a rather contemptuous attitude when served with copies of the injunctive order; but these acts were not set forth in the petition herein, and have not been considered by the court in arriving at its judgment. Upon the whole, the court is of opinion that, considering the exculpatory oaths of the defendants themselves, and their solemn asseverations that they intended no violation of the order of the court, this is a case calling for justice tempered with mercy; but, if the evidence had shown that these men had intentionally and willfully violated the order of the court, it would have become its duty to have made the punishment adequate to such intentional and willful violation. It is therefore adjudged, ordered, and decreed that the rules heretofore awarded against John Richards, Jim Sizemore, H. A. Moseby, George Holcomb, M. W. Ratliff, H. D. Hutchinson, C. Totten, C. W. Stewart, Vint Miller, Wm. Snyder, John Uposky, Bert Campbell, Jas. Hager, M. M. Mason, H. F. Hawks, J. W. Ewing, Ed. Scott, Robt. Mason, Anderson Allen, and T. R. De Long be made absolute. The court does not find that all of these men have been equally guilty of violating its injunction, but is impressed with the idea that, although technically guilty, perhaps none of the men have intended to put themselves in the attitude of disobedience to the court's orders, and will therefore not attempt to draw any fine distinctions between those who have been adjudged guilty, and will inflict as mild a penalty as, in its judgment, could be done, with the hope and in the belief that both those so held guilty and others who may know of this proceeding will in the future endeavor to keep themselves within lines of safety in regard to these orders; and the court desires now to make it known to all and sundry who may be affected by the injunction orders entered in the several cases now before it that any future violations of those orders, if proved, will be severely dealt with. The only reason that the court does not now inflict a severe punishment is because it gives credence to the sworn answers and testimony of defendants that in what they did they were ignorant that they were violating the court's order.

The sentence of the court is that you, John Richards, Jim Size-more, C. W. Stewart, Vint Miller, Wm. Snyder, John Uposky Bert Campbell, Jas. Hager, M. M. Mason, H. F. Hawks, J. W. Ewing,. Ed. Scott, Robt. Mason, Anderson Allen, and T. R. De Long, and each of you, be fined the sum of $5, to be paid into the treasury of the United States, together with the costs of the rule and attachment issued herein, and that you stand committed until this sentence is complied with, or bond, with good security, is entered into before the clerk of this court for the payment of said fines and costs.