## *In re* LENNON.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 254.　Submitted March 30, 1897. — Decided April 19, 1897.

Parties to collateral proceedings are bound by the jurisdictional averments in the record, and will not be permitted to dispute them except so far as they may have contained a false recital with respect to such parties.

Where the requisite citizenship appears on the face of a bill, the jurisdiction of the court cannot be attacked by evidence *dehors* the record, in a collateral proceeding by one who was not a party to the bill.

A bill brought solely to enforce compliance with the Interstate Commerce Act, and to compel railroad companies to comply with such act by offering proper and reasonable facilities for interchange of traffic with the company, complainant, and enjoining them from refusing to receive from complainant, for transportation over their lines, any cars which might be tendered them, exhibits a case arising under the Constitution and laws of the United States of which a Circuit Court has jurisdiction.

To render a person amenable to an injunction, it is neither necessary that he should have been a party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears to have had actual notice.

THIS was a petition for a writ of *habeas corpus* originally filed in the Circuit Court for the Northern District of Ohio.

The petitioner alleged that he was a citizen of the State of Ohio, and was unlawfully restrained of his liberty by the marshal, under an order of the Circuit Court of the United States, made in a case pending in that court, wherein the Toledo, Ann Arbor and North Michigan Railway Company, a corporation of the State of Michigan, was complainant, and several railway companies, citizens of Ohio, as well as the Michigan Central Railroad Company, a citizen of Michigan, were defendants.

The bill in that case, which was annexed to the petition as an exhibit, averred the complainant to be the owner of a line of railroad from Toledo, Ohio, northwesterly through the State of Michigan; that a large part of its business consisted in the transportation of freight cars from points in the States of Michigan, Minnesota and Wisconsin to points in Ohio and other States east thereof, and that it was engaged as a common carrier in a large amount of interstate commerce, which was regulated and controlled by the Interstate Commerce Act of Congress. The bill further averred that the defendants' lines of railroad connected with those of complainant at or near Toledo, and that a large and important part of its business consisted in the interchange of freight cars between the defendant and complainant companies, and was subject to the provisions of the Interstate Commerce Act; that it was the duty of the defendant companies to afford reasonable and equal facilities for the interchange of traffic, and to receive, forward and deliver freight cars in the ordinary transaction of business, without any discrimination; that the defendant companies, and their employés, had given out and threatened that they would refuse to receive from complainant cars billed over its road for transportation by complainant to their destination, for the reason that the complainant had employed

as locomotive engineers in its service men who were not members of the Brotherhood of Locomotive Engineers, "an irresponsible voluntary association," and that the locomotive engineers in the employ of the defendant companies had refused to handle cars to be interchanged with the complainant's road; notwithstanding that they continued to afford the other railroad companies full and free facilities for the interchange of traffic, while refusing to transact such business with the complainant, thereby illegally discriminating against it.

Upon the filing of this bill, and upon the application of the complainant, the Circuit Court issued an injunction against the defendants, their officers, agents, servants and employés, enjoining them from refusing to afford and extend to the Toledo, Ann Arbor and North Michigan Railway Company the same facilities for an interchange of interstate business between the companies as were enjoyed by other railway companies, and from refusing to receive from the complainant company cars billed from points in one State to points in another State, which might be offered to the defendant companies by the complainant.

The injunction was served upon the Lake Shore and Michigan Southern Railway Company, one of the defendants, one of whose employés was the appellant, James Lennon, a locomotive engineer, who had received notice of the injunction, and, still continuing in the service of the company, had refused to obey it.

Thereupon the Lake Shore company applied to the court for an attachment against Lennon, and certain others of its engineers and firemen, setting forth that, with full knowledge of the injunction theretofore made, they had refused to obey the order of the court, and deserted their locomotives and engines in the yard of the company, for the reason that Ann Arbor cars of freight were in the trains of such company, and that they had refused to haul such cars and perform their service for that reason.

The persons named, including the petitioner Lennon, being served with an order to show cause, appeared in pursuance of

such order in person and by counsel, and witnesses were examined as to their knowledge of, and as to their violation of, the order. The court found that Lennon was guilty of contempt in disobeying the order of injunction, and imposed a fine of fifty dollars and costs. *Toledo, Ann Arbor & North Michigan Railway Co.* v. *Pennsylvania Co.,* 54 Fed. Rep. 746.

Thereupon Lennon filed this petition, setting forth the above facts, and alleging that the Circuit Court had no jurisdiction or lawful authority to arrest or proceed against him in manner as aforesaid, and that its order and judgment — whereby he was committed to the custody of the marshal — were without authority of law and void: (1) that such order was issued in a suit whereof the Circuit Court had no jurisdiction, because the complainant and one of the defendants, namely, the Michigan Central Railroad Company, were, at the time of the filing of the bill, and ever since have been, citizens of the same State, and that said suit did not arise under the Constitution and laws of the United States; (2) that the Circuit Court had no jurisdiction of the person of the petitioner, because he was not a party to the suit, nor served with any subpoena notifying him of the same; had no notice of the application for the injunction, nor was served with a copy thereof; nor had any notice whatever of the issuing of such injunction; nor of its contents; (3) that the Circuit Court was also without jurisdiction to make the order, because it was beyond the jurisdiction of a court of equity to compel the performance of a personal contract for service and to interfere, by mandatory injunction, with the contract between himself and the Lake Shore and Michigan Southern Railway Company.

Upon a hearing in the Circuit Court it was ordered that the petition be dismissed. Lennon, after appealing to this court, which held it had no jurisdiction and dismissed the appeal, 150 U. S. 393, thereupon appealed to the Circuit Court of Appeals for the Sixth Circuit, which affirmed the decree of the Circuit Court, *Lennon* v. *Lake Shore &c. Railway Co.,* 22 U. S. App. 561, whereupon petitioner applied for and obtained a writ of certiorari from this court.

*Mr. G. M. Barber, Mr. Walter H. Smith, Mr. Frank H. Hurd* and *Mr. James H. Southard* for Lennon.

*Mr. George C. Greene* for Lake Shore and Michigan Southern Railway Company.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The only question which can properly be raised upon this writ is whether the Circuit Court exceeded its jurisdiction in holding the petitioner for a contempt and in imposing upon him a fine therefor. We are not at liberty to consider the testimony, or to inquire whether the facts, as they appeared upon the hearing, justified the action of the Circuit Court. It is only upon the theory that the proceedings and judgment of the court were nullities that we are authorized to reverse its action. It has been too frequently decided, to be now open to question, that a writ of *habeas corpus* cannot be made use of to perform the functions of a writ of error or an appeal. *Ex parte Kearney*, 7 Wheat. 38, 43; *Ex parte Terry*, 128 U. S. 229; *Ex parte Cuddy*, 131 U. S. 280; *Nielsen, Petitioner*, 131 U. S. 176; *Ex parte Tyler*, 149 U. S. 164, 167; *United States* v. *Pridgeon*, 153 U. S. 48.

Acting upon this theory, the petitioner claims that the Circuit Court exceeded its jurisdiction in adjudging him guilty of contempt, for the reason that it had no jurisdiction of the original bill, because one of the defendants to such bill was a citizen of the same State with the complainant; because petitioner was not a party to the suit and was never served with a subpœna or the injunction; and, finally, because it was beyond the jurisdiction of a court of equity to compel the performance of a personal contract for service.

1. The original bill averred the complainant — the Toledo, Ann Arbor and North Michigan Railway Company — to be a corporation and citizen of the State of Michigan, and the several railway companies defendant to be citizens either of Pennsylvania or Ohio; and there is nothing in the record of

that case to show that this averment was not true. It only appears to be otherwise by an allegation in the petition for the *habeas corpus;* and the question at once arises whether, where the requisite citizenship appears upon the face of the bill, the jurisdiction of the court can be attacked by evidence *dehors* the record in a collateral proceeding by one who was not a party to the bill. We know of no authority for such action. The general rule is that parties to collateral proceedings are bound by the jurisdictional averments in the record, and will not be permitted to dispute them except so far as they may have contained a false recital with respect to such parties. Doubtless the averments with regard to citizenship might have been directly attacked by any one who was a party to that suit. But this cannot be done upon *habeas corpus.* *Michaels* v. *Post,* 21 Wall. 398; *Hudson* v. *Guestier,* 6 Cranch, 281; *McCornick* v. *Sullivant,* 10 Wheat. 192, 199; *Thompson* v. *Tolmie,* 2 Pet. 157; *Ex parte Watkins,* 3 Pet. 193; *Grignon's Lessee* v. *Astor,* 2 How. 319; *United States* v. *Arredondo,* 6 Pet. 691, 709; *Florentine* v. *Barton,* 2 Wall. 210; *Comstock* v. *Crawford,* 3 Wall. 396; *Dyckman* v. *New York,* 5 N. Y. 434; *Jackson* v. *Crawford,* 12 Wend. 533; *Betts* v. *Bagley,* 12 Pick. 572; *Fisher* v. *Bassett,* 9 Leigh, 119, 131; *Dowell* v. *Applegate,* 152 U. S. 327.

Irrespective of this, however, we think the bill exhibited a case arising under the Constitution and laws of the United States, as it appears to have been brought solely to enforce a compliance with the provisions of the Interstate Commerce Act of 1887, and to compel the defendants to comply with such act, by offering proper and reasonable facilities for the interchange of traffic with complainant, and enjoining them from refusing to receive from complainant, for transportation over their lines, any cars which might be tendered them. It has been frequently held by this court that a case arises under the Constitution and laws of the United States, whenever the party plaintiff sets up a right to which he is entitled under such laws, which the parties defendant deny to him, and the correct decision of the case depends upon the construction of such laws. As was said in *Tennessee* v. *Davis,* 100 U. S. 257, 264:

"Cases arising under the laws of the United States are such as grow out of the legislation of Congress, whether they constitute the right or privilege, or claim or protection, or defence of the party, in whole or in part, by whom they are asserted." See also *Starin* v. *New York*, 115 U. S. 248, 257; *Kansas Pacific Railroad* v. *Atchison, Topeka &c. Railroad*, 112 U. S. 414; *Ames* v. *Kansas*, 111 U. S. 449, 462; *Railroad Co.* v. *Mississippi*, 102 U. S. 135.

2. The facts that petitioner was not a party to such suit, nor served with process of subpœna, nor had notice of the application made by the complainant for the mandatory injunction, nor was served by the officers of the court with such injunction, are immaterial; so long as it was made to appear that he had notice of the issuing of an injunction by the court. To render a person amenable to an injunction it is neither necessary that he should have been a party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears to have had actual notice. High on Injunctions, § 1444; *Mead* v. *Norris*, 21 Wisconsin, 310; *Wellesley* v. *Mornington*, 11 Beav. 181.

Conceding the question whether he had such notice in this case to be open to review here, we are of opinion that upon the facts appearing in this record this question must be answered, as it was answered in the court below, in the affirmative. The testimony upon this point is fully set forth in the opinion of the Circuit Court, 54 Fed. Rep. 746, 757, and it establishes beyond all controversy that Lennon had notice and knowledge of the injunction.

It appears that, immediately after the injunction order was granted and served upon the Lake Shore company, the company had copies of the order printed, and attached thereto a notice, signed by its superintendent, calling the attention of employés to the injunction; that printed copies of the injunction and notice were posted on all the bulletin boards at roundhouses where engineers took their engines, and that it was the duty of engineers to examine all notices so posted before starting on their runs. That on the morning of the 18th of March, Lennon was upon his engine at Alexis, mak-

ing a run with his train from Monroe to Toledo; that on his arrival at Alexis, and before he refused to receive and haul the Ann Arbor car, Mr. Chillcote, an agent of the Lake Shore Company, handed to him (Lennon) a printed copy of said injunction order, and the notice signed by the general superintendent, and he received and examined them.

Mr. Chillcote says: "I handed him these papers and he said he had seen the order; that it was posted somewhere; I think at the roundhouse, I think at Detroit. I wouldn't say positive as to that; but he said he had seen a copy of it. . . . I simply handed it to him, and he said, 'We understand the order,' or 'We have seen the order,' or words to that effect." Chillcote further says: "He stated when I handed him the order, before he read it, that he understood it."

Mr. Keegan testified that he was present when the copy of the order was handed to Lennon, and that he said, "I have seen it before." This occurred about 10 o'clock A.M., and Lennon, after having the copy of the order delivered to him and admitting that he had seen it before and understood it, refused to receive the Ann Arbor car until after 2.30 P.M., when he received a telegram from Mr. Watson, an officer of the Brotherhood of Locomotive Engineers, saying, "You can come along and handle Ann Arbor cars," and he then at once proceeded with his train to Toledo, receiving and hauling the Ann Arbor car.

3. To the objection that it was beyond the jurisdiction of a court of equity to compel the performance of a personal contract for service, and to interfere by mandatory injunction with petitioner's contract with the railway company, it is sufficient to say that nothing of the kind was attempted. The petitioner, as one of the employés of the Lake Shore railway, was enjoined from refusing to extend to the Ann Arbor railway such facilities for the interchange of traffic on interstate commerce business between such railways as were enjoyed by other companies, and from refusing to receive from the Ann Arbor company cars billed from points in one State to points in other States. No attempt was made to interfere with peti-

tioner's contract with his own company, or to compel a continuance of his service in such company. There could be no doubt of the power of the court to grant this injunction, which bore solely upon the relations of the railway companies to each other. It was alleged in the bill to have been a part of the regular business of the defendant roads to interchange traffic with the Ann Arbor road, and the injunction was sought to prevent an arbitrary discontinuance of this custom. Perhaps, to a certain extent, the injunction may be termed mandatory, although its object was to continue the existing state of things, and to prevent an arbitrary breaking off of the current business connections between the roads. But it was clearly not beyond the power of a court of equity, which is not always limited to the restraint of a contemplated or threatened action, but may even require affirmative action, where the circumstances of the case demand it. *Robinson* v. *Lord Byron*, 1 Bro. C. C. 588; *Hervey* v. *Smith*, 1 Kay & Johns. 389; *Beadel* v. *Perry*, L. R. 3 Eq. 465; *Whitecar* v. *Michenor*, 37 N. J. Eq. 6; *Broome* v. *New York & New Jersey Telephone Co.*, 42 N. J. Eq. 141.

It appears from the testimony in this case that Lennon was on his run as engineer from Detroit, Michigan, to Air Line Junction, near Toledo, with a train of forty-five cars. Having reached an intermediate station called Alexis, he was ordered to take on an empty car from the Ann Arbor road. He refused to take the car into the train and held the train there for five hours, and then proceeded on his run after receiving a dispatch from the chairman of a committee of the Engineer Brotherhood instructing him to " come along and handle Ann Arbor cars." When he first received the order at Alexis to take the Ann Arbor car he refused, and said, " I quit," but afterwards agreed with the superintendent of the division to take the train to its destination if the order to take the boycotted car was countermanded. Though he claimed to have quit at Alexis at about 10 o'clock he brought his train to its destination, and when told what his next run would be gave no notice of having quit or intending to quit.

It is not necessary for us to decide whether an engineer may

suddenly and without notice quit the service of a railway company at an intermediate station or between stations, though cases may be easily imagined where a sudden abandonment of a trainload of passengers in an unfrequented spot might imperil their safety and even their lives. It is sufficient, in the present case, to observe that the court found, upon the testimony, that the petitioner did not quit in good faith in the morning, but intended to continue in the company's service, and that his conduct was a trick and device to avoid obeying the order of the court.

The finding of the court in this particular is not open to review, and hence the question whether the court has power to compel the performance of a personal contract for service does not arise. It was a question for the court to determine whether the petitioner's action in delaying the train five hours at Alexis was taken in pursuance of a determination to abandon the service of the company, or for the purpose of disobeying the lawful injunction of the court. The finding of the court was against the petitioner upon that point.

There was no error in the judgment of the Court of Appeals, and it is, therefore,

*Affirmed.*