FARMERS GRAIN CO. et al. v. TOLEDO,
P. & W. R. R. et al.

No. 9114.

Circuit Court of Appeals, Seventh Circuit.
Nov. 20, 1946.
Writ of Certiorari Granted March 31, 1947.

110

MAJOR, Circuit Judge, dissenting in part.

Clarence W. Heyl, of Peoria, Ill., John E. MacLeish, Charles M. Price, and Leland K. Neeves, all of Chicago, Ill., for appellant.

John E. Cassidy, John F. Sloan, Stanley Crutcher, Harry E. Witherell, George Z. Barnes, and Louis F. Knoblock, all of Peoria, Ill., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal by the Toledo, Peoria & Western Railroad Company from a judgment appointing a receiver to take possession of all its properties and to operate its railroad, and enjoining appellant and all others from interfering with his possession or operation.

The controversy which gave rise to the present action arose out of labor difficulties between defendant-appellant, the railroad company, and the defendants-appellees. The latter are labor unions in which, it is alleged, 90% of appellant's employees hold membership. These difficulties began prior to 1940 and they grew in intensity as time passed.

On January 3, 1942, appellant filed a complaint, asking an injunction against the striking union, in the same district court from which this appeal is taken. After an extended hearing, the injunction was granted. Upon appeal, this court affirmed that decree on December 16, 1942. Toledo, Peoria & Western Railroad Co. v. Brotherhood of Railroad Trainmen, 7 Cir., 132 F.2d 265. In this opinion are set forth the District Court's rulings and its reasons therefor. Upon appeal to the Supreme Court our decision was reversed on January 17, 1944. Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad, 321 U.S. 50, 64 S.Ct. 413, 88 L. Ed. 534, 150 A.L.R. 810. That opinion held that a railroad company which refused to submit a labor dispute to arbitration in accordance with provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., although it had sought to settle the dispute by negotiation and by mediation, had not made every reasonable effort to settle the dispute, within the meaning of section 8 of the Norris-LaGuardia Act, 29 U.S.C.A. § 108, and was thereby barred by the Acts of Congress, from injunctive relief in the federal courts. In other words, it was held that the appellant was not entitled to an injunction until it had sought to settle the dispute by all three of the prescribed methods of conciliation, to wit: negotiation, mediation and arbitration; that it had not agreed to arbitrate the dispute, and while it was not required to do so, yet if it failed to make an offer to do so it deprived itself of the right to an injunction. In that case plaintiffs' present counsel represented

the labor unions, and the latter are now represented by other different counsel.

This complaint, which was filed February 20, 1946, alleges that plaintiffs are shippers whose places of business are on appellant's right of way; that the federal government had been in possession of the railroad from March 22, 1942 until October 1, 1945, at which time possession was relinquished to appellant; that on or about September 20, 1945, more than four-fifths of the employees who were in the service of the government in and during its operation of the railroad had voted to quit work; that the strike was effective as of 12:01 A.M. on October 1, 1945; that appellant and the Brotherhoods did not engage in collective bargaining prior to October 1, 1945; that on that date transportation of interstate commerce terminated; that since said date appellant's facilities have been abandoned; that such abandonment will continue and plaintiffs and others similarly situated will be denied service until a working agreement is entered into between appellant and the Brotherhoods; that the president of appellant, who was in complete control of it, has refused to engage in collective bargaining in good faith; that cessation and abandonment of the railroad was also the result of failure of defendant Brotherhoods and unions since October 1, 1945, to exert efforts to persuade the president to meet with them and collectively bargain; that such cessation of service and abandonment of interstate commerce by the defendant company and the other defendants is contrary to the laws and public policy of the United States and of the State of Illinois, and is a source of disorder, disturbance of the peace, and against the general welfare; that such cessation and abandonment is injuring the property and rights of plaintiffs and the public, and is causing irreparable loss to defendant company through deterioration of its equipment and rolling stock, and is injuring the property of defendant's stockholders; that such cessation and abandonment is preventing the employment of more than five hundred persons, and is a loss and injury to any and all persons, and is to the advantage or gain of no one; that upon information and be-

lief, the defendant Brotherhoods, unions and employees are ready and will immediately return to work and resume rail service and the free flow of interstate commerce under the same conditions and rates of pay that were in force and effect from March 22, 1942, until October 1, 1945, when the defendant company was operated by the United States Government, which conditions and rates of pay have been and are the same as those in effect on other railroads in the United States.

The complaint prayed generally for relief in the premises and that the court invoke such means as necessary to bring about the prompt resumption of transportation of interstate and all commerce on said Railroad, and that the court order such remedy as is necessary to effectuate the prompt availability to plaintiffs and other shippers of rail service on that railroad. It prayed specifically that the court enjoin the appellant, the defendant unions and all persons from further abandonment of operation of the railroad. It further prayed specifically that the court appoint a receiver to take possession of all the properties, franchises, equipment and facilities of the Railroad, and that such receiver be ordered to restore rail service and free flow of interstate transportation and other commerce on such railroad immediately, and that such receiver retain possession of all of such property and equipment and direct the operation of said railroad under supervision of the court until the further order of such court, and that the court grant such other relief in the premises as is meet and in the interests of the plaintiffs, the public and for the security of the general welfare.

On March 20, 1946, plaintiffs filed a petition for the appointment of a temporary receiver, alleging that appellant and the Brotherhoods had attended a meeting called at the request of Governor Green; that no agreement was reached between appellant and the Brotherhoods at that meeting and that afterwards the parties were no nearer settlement than they had been before; that since October 1, 1945, appellant's railroad has been closed down and has transported no freight over its line. It further alleged that there was no ap-

parent possibility of any agreement between the parties or that the railroad could be placed in operation to perform its duties as a common carrier, unless a receiver appointed by that court should take possession of it and begin operation.

The Brotherhoods, in their answer to this petition for a temporary receiver, stated among other things, that the meeting referred to in the petition had been held and that no agreement had been reached, but denied that there was no apparent possibility of any agreement between the parties, or that the railroad could not be placed in operation to perform its duties as a common carrier unless a receiver was appointed. A petition for temporary relief, similar to that filed by plaintiff on March 20, 1946, was filed by plaintiffs on May 3, 1946. Neither of the two last-named petitions filed by the plaintiffs was acted upon by the court.

Appellant answered the complaint in substance that its railroad had been in possession of, and had been operated by, the Government through a federal manager from March 22, 1942, until October 1, 1945; that on September 13, 1945, the Brotherhoods made written demand upon appellant, insisting that from and after October 1, 1945, all of the terms and conditions under which appellant's properties had been operated by the federal manager should apply to appellant; that on September 29, 1945, appellant offered to continue in effect the federal manager's rates of pay and rules, and to employ all who were employees of appellant on March 22, 1942, and the employees of the federal manager, except those who had engaged in acts of violence in late 1941 and early 1942, with historical seniority; that effective at midnight, September 30, 1945, the federal manager terminated the employment of almost all of his employees; that at that time appellant was confronted with the seizure of its property by the Brotherhoods in what they termed a strike; that negotiations subsequently were had with the Brotherhoods, seeking a mutually agreeable disposition of all controversial questions, but that said negotiations had proved unavailing; that appellant had at-

tempted to operate its railroad, but was prevented from doing so through the violent acts and unlawful conduct of the Brotherhoods; that appellant had sought protection from the public authorities sufficient to operate its road, but such protection had not been furnished, and proper operation and interchange with other railroads could not be carried out; that many of appellant's employees had been hurt by pickets, property had been damaged, shooting had occurred, and that in one instance certain of the pickets had been shot and killed by armed special agents (acting in self-defense) employed by appellant in the attempted operation of one of its trains; that the unlawful conduct and acts of violence of which the Brotherhoods were guilty were similar in kind and character to those involved in the earlier suit in which the judge had granted an injunction which was affirmed by this court and reversed by the Supreme Court on the ground that appellant had not agreed to arbitrate as required by the Norris-LaGuardia Act, as above stated; that appellant had not abandoned its road, but had not been able to operate the same due to the unlawful conduct on the part of the Brotherhoods, and, that if given adequate protection, appellant had available, or could procure, a sufficient number of properly trained employees to operate the road and render service to the shippers and to the public at large.

Appellant further alleged in its answer that plaintiffs had no interest or title to any of appellant's properties which would authorize the appointment of a receiver; nor did the complaint disclose that any one or more of the plaintiffs had any interest in or right to compel a court to settle a labor controversy by seizing the property and assets of one party to said controversy.

With this answer appellant also filed a cross complaint by which it sought injunctional relief against the continued violence and unlawful conduct on the part of the Brotherhoods against, and interference with the operation of the railroad.

The Brotherhoods' answer consisted largely of admissions of certain allegations of the complaint or statements that

the allegations were neither admitted nor denied. Their answer specifically stated that they were ready and would immediately return to work and resume the rail service and the free flow of interstate commerce under the same conditions and rates of pay that were in force and effect on September 30, 1945, when the road was being operated by the Government.

The Brotherhoods moved to dismiss the complaint, and made the same motion at the close of plaintiffs' evidence. These motions were denied by the court in its judgment of June 6, 1946.

Material to the issues here joined, the court on June 6, 1946, made in substance the following findings of fact and conclusions of law:

On September 6, 1945, the Director of the Office of Defense Transportation ordered that management of appellant be returned to its private management on September 30, 1945. On September 13, 1945, the Brotherhoods requested appellant's president to confer with respect to a continuation of the rates of pay and working conditions which had been in effect under the federal manager. On September 15, 1945, appellant by letter notified the Brotherhood officials that it would not be proper for appellant to make any agreement with them at that time, and that it declined to participate in a meeting, and made no alternate or other proposal; that on or about September 27, 1945, appellant's employees voted to withdraw from service on October 1, and that on September 28 and 29, appellant made certain proposals to the Brotherhoods which the Brotherhood officials would not accept. On October 1, 1945, practically all employees of appellant withdrew from service.

By this finding the court also said that by their letter of September 13, the Brotherhoods had made a bona fide effort for collective bargaining and that the defendant railroad unreasonably frustrated this effort, and that neither appellant nor the Brotherhoods made any reasonable effort to negotiate and engage in collective bargaining prior to the employees' withdrawal from service and cessation of rail transportation on October 1, 1945.

The court further referred to other efforts made to bring the representatives of the defendants into agreement, but found that all such efforts toward mediation and adjustment were unsuccessful. By reason of these facts the court further found that the defendants had maintained an unreasonable disregard for the rights of plaintiff shippers and had acted contrary to the public welfare.

In a further finding the court enumerated various acts of violence and stated that appellant's officials had asked the local law enforcing officials and also the Governor of Illinois for protection; that the requests of all defendants to the law enforcing officers were reasonably complied with, and that appellant's failure to operate was not justified by the railroad's charge that public officials refused or were unable to perform their duty.

It further stated that although incidents of violence occurred and a hostile and provocative attitude by pickets and also employees of defendant railroad was a hazard to the public peace and safety, yet the court could not find that such violence was a sufficient justification for the failure of the defendant to operate its trains unless the court could also find or presume from the evidence that local law enforcing officials and the Executive Officers of Illinois had refused or were unable to perform their official duties. The court said that it could not indulge in such presumption and that the evidence did not permit such finding.

The court found that essential connecting rail carriers of defendant had since October 1, 1945, refused to interchange freight with defendant because of the danger to their employees arising out of the presence of armed guards on defendant's trains and property, and because of the hazards due to the inefficiency of some of defendant's engine crews; that one of the principal reasons for the failure of appellant to operate its trains and provide rail service was that the railroad did not have in its employ a sufficient force of trained and experienced railroad workers to operate its trains and man its equipment, and that such insufficiency of workers was the

result of the appellant's unreasonable refusal in September, 1945, to meet the defendant Brotherhoods, and engage in bona fide collective bargaining. The court further said that such insufficient force of workmen was also the result of the unreasonable and obstinate attitudes of all defendants (which included the Brotherhoods and their officials as well as appellant) and their refusal to make concessions and their failure to genuinely negotiate and bargain for the joint welfare of the employees, the railroad corporation and the public.

The court found that from December, 1941 to March, 1942, many acts of violence were perpetrated by the striking workers of the railroad company; that these conditions were intercepted and relieved by the appointment of a federal manager who made a contract with the Brotherhoods which existed until October 1, 1945, when the road was returned to the appellant; that from October 1, 1945, until the present date, all the Brotherhoods refused to work, and violence has been prevalent on the part of both membership and employees from that day to the present time; that from October 1, 1945, until the present time there has been considerable violence on the part of the present employees of the company and pickets and strikers, until conditions almost justified the statement that a state of war exists between these two opposing factions. He further stated that in his opinion, conditions were such that "a future settlement of the determined contentions of each of the parties is highly improbable."

The court's conclusions of law, material to the issues here presented, are substantially as follows:

The evidence does not establish that local law enforcing officers and the Executive Department of the State of Illinois have either refused or are unable to perform their public duties to keep the peace and afford protection, and the railroad's defense of violence and interference is not sufficient to excuse the failure to operate its trains and provide service.

Upon withdrawal from service, the union members had the lawful right to engage in peaceful picketing. They had no right,

however, to engage in violence or unlawful interference with defendant's property. Neither did defendant have a right to provoke tension by the dangerous use of firearms and other provocative measures.

Appellant's refusal to arbitrate between 1941 and March 1942, and to respond to the order of the War Labor Board and the request of the President of the United States was not a reasonable discharge of its obligations to the public welfare. The refusal of defendant to comply with the Brotherhoods' request for a conference on September 13, 1945, amounted to a failure of defendant to fulfill its legal duty to engage in collective bargaining, and the failure of the Brotherhoods to request additional steps for negotiation of appellant's proposal of September 29, 1945, constituted a lack of full effort on their part to pursue collective bargaining.

Appellant knew, or should have known, that the natural and probable consequences of its labor policy would result in cessation of interstate commerce and abandonment of its operations.

It is the duty of the District Court to give effect to the law by compelling the prompt resumption of the safe, free and uninterrupted flow of interstate commerce on the railroad, and to accomplish that result it concluded that it should appoint a receiver of appellant to operate the railroad under that court's supervision, and that all persons should be enjoined from interfering with the receiver in the performance of his duties.

The court further concluded that an injunction in favor of appellant against the Brotherhoods and other appellees-defendants, as prayed in its cross complaint, "would not amount to relief sufficient to achieve prompt and complete resumption of the operations on defendant Railroad," and in view of the order of the court for the appointment of a receiver, and an order enjoining all interference with the receiver, the defendant railroad's cross complaint should be dismissed.

The decree, entered on June 6, 1946, in substance denied the motions of all defendants to dismiss the complaint, and also dismissed appellant's cross complaint. It al-

so appointed Fred Windish, "not an experienced railroad official, but an efficient business man who has no interest on behalf of either of the defendants," as receiver of all of the properties, franchises and assets of appellant.

It further decreed that the receiver, upon filing his bond in the sum of $10,000 for the faithful performance of his duties should "take possession of all the real and personal property, franchise rights and other assets tangible and intangible of" appellant, "and operate or arrange to operate such Railroad in such manner as will furnish satisfactory and adequate rail transportation to all members of the public subject to the approval of this Court," and that "all defendants, persons, firms and corporations be and they are hereby enjoined from interfering with the Receiver in obtaining possession of these properties or with his possession or with his operation of the Railroad."

On June 12, 1946, appellant filed its verified motion to vacate the decree and enter a decree in its favor, or to vacate the decree and hear further evidence. This motion disclosed that the case had been closed on May 17, 1946, argument of counsel heard on May 20 and 21, and the decree entered on June 6, 1946; that the shooting on February 6, 1946, above referred to, concerning which testimony had been introduced at this trial, had resulted in the indictment of four of appellant's employees for manslaughter in McLean County, Illinois; that a trial of those defendants had been had in the Circuit Court of that County, which resulted in an acquittal on May 24, 1946.

The motion further disclosed that since the final arguments in this case appellant had inspected and placed in operating condition the Eastern Division of its railroad running between East Peoria and Effner, Illinois; that on June 4, 1946, appellant had lifted its embargo to permit the acceptance of all carload shipments, excepting perishables and live stock, when originating at or destined to stations between East Peoria and Effner, and had established daily service, except Sunday, to shippers located on the Eastern Division; that since June 4, 1946, appellant had daily, except Sunday, operated a train between East Peoria and Effner, and had furnished to the shippers on the Eastern Division all the services they had requested; that since June 4, 1946, appellant had completed transportation of certain cars on its line; that connecting railroads, with one exception, had advised appellant that they would accept and handle cars in exchange from appellant, although certain other railroads had stated that such handling would depend upon freedom from interference, and the Peoria and Pekin Union Railroad had issued on June 4, 1946, an embargo against all shipments to and from appellant. This motion further alleged that appellant was able to hire a sufficient number of employees to operate its lines, if it ultimately proved to be impossible to agree with the Brotherhoods; that since the closing arguments in this case, appellant and the Brotherhoods had conferred with respect to a settlement of their differences, and their endeavors were continuing when this decree was entered.

This motion was denied. The receiver was appointed and his bond for faithful performance was filed and approved. Plaintiffs were not required to give bond.

The first question presented is whether the District Court under the evidence was authorized by law or equity to appoint a receiver of appellant. That court quite succinctly stated the question in the following language: "Whether * * * this court can, under the law, because of an injury to the public appoint a receiver over a financially sound institution, and more or less abolish the rights of arbitration or the rights of dealing with labor and capital." His ruling was in the affirmative, and by it we think the methods prescribed by Congress for dealing with controversies between capital and labor were indeed abolished with respect to this case. It is admitted by plaintiffs and the District Court that the decree provides a new and unprecedented method of solving labor disputes by appointing a receiver of appellant's property, which was specifically prayed for in the complaint, together with the usual prayer for general relief. True, there was an additional prayer that the

receiver be ordered to operate the property and that in so doing he be protected by injunctive process. Such prayer was granted as is usual in all federal equity receiverships. Every equity receiver is appointed for the purpose of either preserving, liquidating or operating the property involved. It is admitted that this appointment was not made for the purpose of liquidation, nor was it made for the purpose of preserving the property, for plaintiffs had no interest in it, either legal or equitable, nor did they have a claim of any kind against it.

█ It is clear that the ultimate aim of the action was the appointment of a receiver for the sole purpose of operating the railroad, without any limitation as to time, and not being ancillary to other equitable or legal relief sought. Under these circumstances we think the decree was improper. Kelleam v. Maryland Casualty Company, 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899; Gordon v. Washington, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282; Pusey & Jones Co. v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763; Re Metropolitan Railway Receivership, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403; 16 Fletcher Cyclopedia of Corporations, Sec. 7683.

Appellant further contends that the District Court erred in dismissing its cross complaint in which it asked for an injunction against the defendant-appellees. In its conclusions of law, the court stated in effect, as one of its reasons for such ruling, that it was unnecessary to grant that relief to appellant because it had granted the same relief to the receiver, and further, that to grant an injunction to appellant "would not amount to relief sufficient to achieve prompt and complete resumption of the operations on * * * (the) railroad." This latter statement is consistent with only one of two conceivable facts. Either the receiver contemplated granting the unions' demands, or the court thought that the unions would not obey an injunction issued to appellant. We are reluctant to indulge in that thought for that would be to presume an unpatriotic act on the part of the unions as well as all participating courts.

A further reason for dismissing the cross complaint, as set forth in its conclusions of law, was that appellant had not reasonably discharged its obligations to the public welfare, because it had refused to arbitrate its controversies with the Union in 1941 and March 1942, and that it did not respond to the order of the War Labor Board and the request of the President of the United States. At that time, of course, there had been no offer to arbitrate, as shown in the opinion of the Supreme Court in the former case (321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, 150 A.L.R. 810), in which, however, it was held that appellant at that time had performed all of its duties as to negotiation and mediation as the District Court in the former case had found. Of course, the War Labor Board never issued a mandatory order in this case, nor did it have the power to do so. Its order, as well as that of the President, was purely recommendatory, and neither was binding on appellant.

This ruling is further based on the appellant's refusal to comply with the Brotherhoods' request for a conference on September 13, 1945, as stated in the conclusions of law. The reason for not thus participating was that none of the employees concerned were then in appellant's employment, but all were in the employment of the Government and would be until October 1. However, on September 29, appellant proposed to the Brotherhoods to adopt the federal manager's pay and working conditions as of September 30, 1945, also to adopt the principle of historical seniority with respect to all appellant's former employees and those of the federal manager; to give employment to all for whom jobs might be available, with the exception of 23 persons who had been found by the court in 1942 to have been guilty of unlawful conduct and acts of violence against appellant and who had been named in the injunctional order of the court issued on January 19, 1942, and one other person who had shot at one of appellant's trains in violation of the injunctional order; and to sign an agreement with all of the Brotherhoods, recognizing them as bargaining representatives.

The Brotherhoods refused appellant's proposal of September 29, claiming that the provision concerning the treatment of persons who had engaged in acts of violence was unacceptable to them, and later they refused the provision relating to historical seniority, and so far as this record discloses there were no other questions involved. Even after October 1, there were other negotiations and proposals through the Illinois Commerce Commission, and the National Mediation Board.

Appellant offered to arbitrate under an arbitrator appointed either by the senior federal judge of that district, or the trial judge, or the senior circuit judge of this circuit, or by the Illinois Commerce Commission, and finally appellant proposed to arbitrate their two remaining differences, or any others which might arise, under the terms of the Railway Labor Act. The Brotherhoods rejected all of these proposals, notwithstanding their answer denying the allegation in plaintiffs' petition that the railroad could not be placed in operation to perform its duties as a common carrier unless a receiver was appointed.

■ Under these circumstances which are undisputed, we think it cannot be said that appellant failed either to negotiate, mediate or arbitrate as contemplated by the former decision in this case by the Supreme Court.

■ The court found that the parties did not bargain or negotiate in good faith, and that their failure to agree was the result of the unreasonable and obstinate attitudes of all defendants and their refusal to make concessions. At the close of the trial, however, he said: "I know that there is an honest disagreement on the part of the management of the railroad company and perhaps an honest—and I know an honest disagreement on the part of the employees of the Brotherhoods." Of course this statement of the court would not of itself annul its findings of lack of good faith in negotiating and bargaining, but it conclusively shows that the finding is based solely on the fact that the parties did not reach an agreement, which under the law does not constitute a proper basis for such finding. The statutes provide a remedy for such a situation by arbitration, which if accepted becomes binding on all parties, and if not accepted, the applicant is furnished with injunctive process for its protection under the ruling of the Supreme Court in the earlier case, 321 U.S. 50, 14 S.Ct. 413, 88 L.Ed. 534, 150 A.L.R. 810.

■ The law does not require the Brotherhoods or the appellant to enter into an agreement which is not mutually satisfactory. Virginian Railway Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; N. L. R. B. v. Jones & Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

■ It is urged by appellees that the appointment of a receiver will not be injurious to appellant. Conceding this arguendo, it furnishes no basis for the appointment of a receiver. 53 Corpus Juris on Receivers, § 21; 45 American Jurisprudence on Receivers, § 30; 16 Fletcher, Cyclopedia Corporations, § 7728.

■ Appellees urge quite strongly that appellant has abandoned its railroad because, as it appears, the road cannot operate because of the unlawful interference of the Brotherhoods and because of the unlawful refusal of the connecting lines to interchange traffic with appellant. There is no merit in this contention. Townsend v. Michigan Cent. R. Co., 6 Cir., 101 F. 757; Williams v. Atlantic Coast Line Co., 4 Cir., 17 F.2d 17; Chicago & E. I. R. v. Clapp, 201 Ill. 418, 66 N.E. 223; Toledo, Peoria & Western R. R. Co. v. Brotherhood, supra; Interstate Commerce Act, § 3(3), 49 U.S.C.A. § 3(3); Smith-Hurd Ill.Ann.Statutes, chap. 111⅔, § 44.

■ It seems to be well settled that appellant cannot be required to operate its road in the face of unlawful conduct and the acts of violence on the part of the Brotherhoods, especially where such conduct approaches the magnitude of civil war as found by the court in the case at bar. See Empire Transportation Co. v. Philadelphia & Reading Coal and Iron Co., 8 Cir., 77 F. 919, 35 L.R.A. 623; Geismer v. Lake Shore & Michigan Railroad Co., 102 N.Y. 563, 7 N.E. 828, 55 Am.Rep. 837.

See also Toledo, Peoria & Western R. R. v. Brotherhood, supra; People v. New York Central R. R. Co., 28 Hun, N.Y., 543; and Jonesborough, L. C. & E. R. Co. v. Maddy, 157 Ark. 484, 248 S.W. 911, 28 A.L.R. 503; Ritchie v. Oregon Short Line R. Co., 42 Idaho 193, 244 P. 580, 45 A.L.R. 919.

In its conclusions of law the court states that the enforcing officers and executive department of the State of Illinois have neither refused nor been unable to perform their public duties to keep the peace and afford protection to the defendant for the operation of its road. We are not disposed to labor this matter. The record does not inform us as to the specific duties of these officers, nor is it necessary that we should make further investigation on this subject. The undisputed evidence is that this road has been unable to run for quite a long period of time, and of course it is admitted that this is due to the labor troubles which are now before us. These troubles have grown in intensity, and they have resulted in the deaths of three human beings. It is undisputed that these troubles have never been alleviated by the officers referred to. Whether this was due to the officers' inactivity or inability, or beyond the scope of their duty is immaterial at the present time. This condition has existed so long that it has become a stench in the nostrils of patriotic citizens of Illinois, and it should be stopped by due process of law.

▮ Appellant has urged with considerable emphasis that the District Court was without jurisdiction to hear this case. We are indeed doubtful of the merit of this contention because of the very wide latitude of plaintiffs' prayer for relief. It sought any relief which the court might properly give and we see no reason why under that pleading and this evidence the District Court could not have issued a mandatory injunction against the appellant to continue the operation of its road and also protect the appellant by an injunction such as it has issued to the receiver. Of course, it did not do this. However, we do not feel disposed to hold that the District Court was without jurisdiction to hear the case. Its jurisdiction does not depend upon the correctness of its decision.

The defendant appellees urge that appellant's cross complaint was insufficient to support an injunction in favor of appellant against interference with its operation of the road because the cross complaint was not verified by oath, nor did it disclose that notice of past unlawful interference, or such threatened interference, was given to the chiefs of those public officials, charged with the duties to protect appellant's property in the counties and cities within which such unlawful acts were threatened or committed, nor was summons issued upon the cross complaint, and served upon any appellee.

▮ The propriety of an injunction against interference in the road's operation inheres in the issues raised by the complaint and answers. Plaintiffs ask for equitable relief by way of mandatory injunction, to compel appellant to operate the road. It is elemental that the law will never require the performance of an act unless it is physically possible to perform it. Appellant's answer alleges acts of the Brotherhoods and their associates which, if true and continued, render the operation of the road impossible. The cross complaint for injunction is based, by reference, upon the allegations of interference as set forth in the answer. The court dismissed the cross complaint for injunction although it enjoined any interference with the operation of the road by the receiver which it appointed. The reason for this ruling is set forth in the court's 9th conclusion of law,[1] to which no objection was, or is now, made by any appellee.

▮ As stated before we think plaintiffs are entitled to the mandatory injunc-

---

[1] Conclusion of Law 9.

"The Court finds that an injunction as prayed in the cross-complaint of defendant Railroad against the Brotherhoods and other defendants would not amount to relief sufficient to achieve prompt and complete resumption of operations on defendant Railroad, and in view of the order of the Court herein for the appointment of a Receiver and an order enjoining all interference with such Receiver, such cross-complaint of defendant Railroad should be dismissed."

tion, providing appellant is protected by an injunction against interference by anyone in the operation of the road. We think the proviso should be adhered to because of the history of this controversy. It is true that our Supreme Court has held that to render a person amenable to an injunction, it is neither necessary that he should have been a party to the suit, nor have been actually served with a copy of it, so long as he appears to have had actual notice of it. In re Lennon, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110. It is quite true that anyone, having actual notice, who might interfere with appellant's compliance with the mandatory injunction would be guilty of contempt and could be punished therefor. Even so, that decision does not in any way militate against the propriety of issuing the injunction against interference, and the latter has the advantage of giving actual and specific notice to the defendant appellees as to the rights of the parties. We think it is preferable practice in view of the magnitude and aggravated history of this case, and the period of time over which it has extended. We think it was never the intention of Congress, nor was it within its power, to prevent a court of equity from protecting its decrees.

It is quite true that the court found in this case, or rather concluded as a matter of law, that the facts did not warrant an injunction against interference. At the same time, in announcing its decision, it stated in effect that the conduct of the parties constituted almost a state of war between appellant and its employees. The truth of that statement is abundantly borne out by the evidence in both cases that have been before us.

In ruling that appellant was not entitled to an injunction against interference, we are convinced from the findings and remarks of the trial court in making its decision, that it was of the opinion, regardless of the conduct of anyone here involved, that the plaintiffs were entitled to a mandatory injunction. This is the only construction that will make the court's findings consist with the language used in pronouncing its decision. Otherwise, the finding, or the conclusion of law, is supported neither by substantial evidence, nor by the facts as found. This also seems to be the position of the appellees. In support of this ruling they rely upon People v. New York Central & Hudson River R. R. Co., 28 Hun, N.Y., 543, and Stephens v. Ohio State Telephone Co., D.C., 240 F. 759. In those cases there was no bad feeling nor were there any depredations of any kind committed, and it was not claimed that they could not have hired other employees to carry on the business. Neither of these cases supports the court's ruling, or appellees' contention, in this respect.

The Stephens case merely holds that the company, if it can find laborers, must employ them and fulfill its public duties. In the New York Central case the mandatory injunction issued. The only excuse alleged for non-performance of its duties was, in effect, that its skilled freight handlers refused to work unless a higher wage was paid. It was not alleged that the workmen committed or threatened any unlawful act. There was no violence, or unlawful interference by the striking workmen. The court held that if there had been, and the company had used all means in its power to employ other men in sufficient numbers to do the work and was unable to do so, a very different case would have been presented. Both cases support the elementary doctrine that no one is ever required by the law to do an impossible thing.

We think it was error to strike the cross complaint. True, it was not verified by oath, however, all the alleged facts upon which it was based were supported, under the issues raised by appellant's answer, by evidence under oath at the trial which lasted many days, in which all appellees participated. The cross complaint does not seek an injunction or a temporary restraining order without notice. It only seeks the same protection that was awarded to the receiver without objection by any appellee. To this we think appellant is entitled.

The decree of the District Court is reversed and the cause is remanded with directions to proceed in accordance with the views herein expressed.

MAJOR, Circuit Judge (concurring in part and dissenting in part).

I agree that the court below was without authority to appoint a receiver and that the proper remedy was a mandatory injunction enjoining the railroad to resume operation. However, I do not agree with some of the reasoning of the majority opinion in connection with this latter proposition. I would hold that the cross-complaint was properly dismissed.

The complaint alleges that the defendant-company has failed since October 1, 1945 to furnish transportation to the plaintiffs and that since said date it has abandoned operation of the railroad. The court below made a finding of an abandonment as alleged, which I think should be accepted by this court. While the opinion approves of a mandatory injunction, I am unable to discern the basis therefor. The opinion appears to hold that there was no abandonment and that the railroad cannot be required to operate in the face of unlawful conduct and the acts of violence on the part of the Brotherhoods. I do not agree with either premise. If the former is correct, I doubt if there is any authority for the issuance of a mandatory injunction, and if the latter is accepted its issuance would be futile. Such an injunction could serve no useful purpose if the railroad cannot be required to comply because of interference from the Brotherhoods or otherwise.

Sec. 1(4) of the Interstate Commerce Act, Sec. 1, Title 49 U.S.C.A., provides: "It shall be the duty of every common carrier subject to this chapter engaged in the transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor * * *." Sec. 1(18) of the same Act provides: "No carrier by railroad subject to this chapter * * * shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment." Sec. 1(20) of the same Act provides: "Any * * * abandonment contrary to the provisions of this paragraph or of paragraph (18) * * * may be enjoined by any court of competent jurisdiction at the suit of * * * any party in interest * * *."

Thus there is imposed upon a railroad the positive duty to provide and furnish transportation of passengers or property, it is prohibited from abandoning all or any portion of its line or the operation thereof, and for failure to discharge this statutory duty may be enjoined at the suit of any party in interest.

As already noted, Sec. 1(18) refers to two separate and distinct forms of abandonment, that is, (1) "of a line of railroad," or (2) "the operation thereof." Assuming that there was no abandonment under the first classification, I am of the view that there was under the second, and that the reason or excuse, whichever it may be, for the abandonment of operation is wholly immaterial. The majority opinion, so I think, places too much stress upon the labor controversy existing between the railroad and its employees and fails to ascribe sufficient importance to the rights of the plaintiffs, the shippers, for whose benefit and on whose behalf the law imposes a positive duty to provide and furnish transportation.

Thus the District Court, in case of abandonment (in this case of operation), is specifically authorized at the suit of any party in interest to command the railroad to comply with its duty as prescribed by statute. In other words, the court by statutory provision had the authority to issue a mandatory injunction. Moreover, there are authorities which support the propriety of such an injunction. Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., et al., C.C., 54 F. 746; In re Lennon, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110; Lucking v. Detroit & C. Nav. Co., 265 U.S. 346, 44 S.Ct. 504, 68 L.Ed. 1047; People v. New York Central & H. R. R. Co., 28 Hun, N.Y., 543; McCran v. Public Service Ry. Co., 95 N.J. Eq. 22, 122 A. 205; Loader v. Brooklyn Heights Railroad Co., 14 Misc. 208, 35 N.Y.S. 996, 999; Stephens v. Ohio State Telephone Co., D.C., 240 F. 759.

The majority opinion appears to hold that in addition to the mandatory injunction a restraining order should be issued against the Brotherhoods for the purpose of enjoining interference with the railroad's operation, the relief prayed for in the rail-

road's cross-complaint. The opinion, however, leaves me in doubt as to whether this restraining order is to be issued upon the cross-complaint or merely as incidental to the issuance of the mandatory injunction. I think, however, such an order at this stage of the proceeding is improper, whichever be the basis for its issuance. Certainly the railroad is not entitled to an injunction against the Brotherhoods for the reason that it admittedly has not complied with the Railway Labor Act and the Norris-LaGuardia Act. In fact, the cross-complaint is not sworn to and its potency as a pleading is nothing more than a scrap of paper. The lower court rightly ordered it stricken.

If, however, the injunction directed at the Brotherhoods is to be predicated upon the premise that it is to issue as ancillary and for the purpose of protecting the court's mandatory injunction, the position is still vulnerable. It likewise raises the question as to whether such an injunction may issue without compliance with the Railway Labor Act and the Norris-LaGuardia Act. Without deciding this question, I would leave the matter to the judgment of the District Court. Assuming that the court has the authority, the necessity for such a restraining order can better be determined after the issuance of the mandatory injunction. This court should not assume that either the Brotherhoods, the connecting carriers or anybody else will interfere with the railroad's compliance therewith.

If, however, there should be interference I have no doubt but that the court is possessed of all the power and authority necessary to enforce compliance with its mandatory injunction. I think there is no limit to its power in this respect. Any person or corporation, whether it be management, employees or a connecting carrier, which obstructs or interferes with this mandatory injunction would be in contempt of court, and this irrespective of whether they are parties to the instant proceeding. Of course, the court is powerless to prevent the present employees from striking or refusing to work, but it has the power to prevent such employees from interfering with other persons who are desirous and willing to work.

This view finds support in Re Lennon, supra. There a certain railroad brought suit against certain other railroads, alleging that they had refused to accept an exchange of cars because the complainant's employees were non-union. The complaint alleged that such refusal was in violation of a duty imposed by the Interstate Commerce Act. A mandatory injunction was issued against the defendant railroad directing a compliance with the duty thus imposed. (A detailed statement of the facts appears in Toledo, A .A. & N. M. Ry. Co. v. Pennsylvania Co. et al., C.C., 54 F. 746.) Certain employees of the defendant refused to obey the injunction by interference with its operation. Among such employees was Lennon, a locomotive engineer. He was cited for contempt, found guilty of disobeying the injunction, a penalty was imposed by the court and he was placed in the custody of the United States Marshal. Thereupon Lennon filed a petition in habeas corpus, alleging that he was unlawfully detained. As the opinion discloses (page 552 of 166 U.S., 17 S.Ct. 658, 41 L.Ed. 1110), the only question considered by the Supreme Court was the jurisdiction of the lower court in holding Lennon for contempt. It was held that the court had jurisdiction of the cause because it was an action brought to enforce compliance with a provision of the Interstate Commerce Act and it therefore was a case arising under the laws of the United States. It was also argued on behalf of the petitioner that the court had no jurisdiction over him inasmuch as he was not a party to the proceeding out of which the mandatory injunction issued. The court in denying this contention stated (page 554 of 166 U.S., page 660 of 17 S.Ct., 41 L.Ed. 1110): "To render a person amenable to an injunction it is neither necessary that he should have been a party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears to have had actual notice."

The court found that Lennon had actual knowledge of the issuance of the injunction and affirmed the lower court. Thus this case is a direct authority upon two propositions material in the instant case, (1) that the court has the authority to en-

force compliance with a statutory requirement by means of a mandatory injunction, and (2) that any person, whether a party to such proceeding or not, who interferes with such compliance would be guilty of contempt providing, of course, he had actual knowledge of the order. It is difficult in the instant case to discern any basis on which the Brotherhoods and their members could claim that they had no notice of such an order, inasmuch as they are actual parties to the proceeding. Moreover, when and if the mandatory injunction issues the lower court would be free to give such further notice as it might deem proper to the Brotherhoods, the connecting carriers or any other person or persons who might be likely to interfere with its mandate.

True, there may be difficulties attendant upon obtaining compliance with the mandatory injunction but that also may be true with any other form of injunction. Such difficulties cannot be aided by doing the novel and unusual thing of ordering one injunction for the purpose of enforcing another. The issuance of this additional injunction will not broaden or increase the power of the court to obtain compliance with its mandatory injunction and neither will it increase the hazard for those who interfere therewith.

So I would reverse the order appointing a receiver, affirm the dismissal of the railroad's cross-complaint and direct the issuance of a mandatory injunction, enjoining compliance by the railroad with its statutory duty to operate.